## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAPTAIN PAUL RADTKE, 360 Spring Street, #235, St. Paul, Minnesota 55102,

OFFSHORE MARINE SERVICE ASSOCIATION, 935 Gravier Street, Suite 2040 New Orleans, Louisiana 70112,

and

SHIPBUILDERS COUNCIL OF AMERICA, 20 F Street, NW, Suite 500, Washington, D.C. 20001,

      Plaintiffs,

    v.

U.S. BUREAU OF CUSTOMS & BORDER PROTECTION, 1300 Pennsylvania Avenue, NW, Washington, D.C. 20229,

and

KEVIN K. McALEENAN, in his official capacity as Acting Commissioner of the U.S. Bureau of Customs & Border Protection, 1300 Pennsylvania Avenue, NW, Washington, D.C. 20229,

      Defendants.

Civil Action No.: 17-2412

**COMPLAINT**

## <u>COMPLAINT</u>

    Plaintiffs Captain Paul Radtke, Offshore Marine Service Association ("OMSA"), and Shipbuilders Council of America ("SCA") bring this Complaint against Defendants U.S. Bureau of Customs and Border Protection ("CBP") and Kevin K. McAleenan, in his official capacity as Acting Commissioner of CBP, and alleges as follows:

- 1 -

**Introduction**

1.      The Jones Act requires that merchandise transported by ship between U.S. points be transported by U.S.-flagged, U.S.-built, and U.S.-crewed ships (i.e., Jones-Act qualified ships).

2.      CBP is responsible for interpreting and enforcing the Jones Act. In fulfilling that role, CBP has issued a large number of interpretive letter rulings addressing whether and how the Jones Act applies in particular factual situations. The effect of those letter rulings is substantial, because vessel operators rely on a letter ruling until it is modified or revoked.  Thus, if CBP authorizes a *foreign*-flagged vessel to transport certain merchandise between U.S. points, the Jones Act becomes a dead letter for all similar shipments—to the detriment of the U.S. domestic maritime industry, until the letter is revoked or modified by CBP.

3.      CBP has acknowledged, repeatedly, that a significant number of its letter rulings violate the Jones Act—because they permit foreign-flagged ships to supplant Jones-Act qualified ships, contrary to the plain language of the statute and Congress's expressed intent.

4.      Congress has established an administrative process for correcting or revoking erroneous letter rulings.  CBP has, for years, stated its intention to revoke or modify the interpretations it identified as inconsistent with the statute.  But the agency has failed to do so on account of objections raised by the foreign vessel interests that convinced the agency to not follow the law in the first place.

5.      Plaintiffs, through this action, request this Court to declare invalid several CBP letter ruling interpretations of the Jones Act that the agency has acknowledged violate the statute, but which the agency is unwilling to revoke or modify, and until it does so, renders the agency

unable to enforce the law. The result is continuing statutory violations by foreign vessel owners, harming the domestic maritime industry.

## **Parties**

6.      Plaintiff Captain Paul Radtke is a United States citizen residing in the State of Minnesota. Captain Radtke has worked in the maritime industry for over three decades, including sixteen years serving as a ship pilot on the Great Lakes and the St. Lawrence Seaway. Most recently, Captain Radtke worked for an OMSA member in the Gulf of Mexico. Captain Radtke holds a license of Master, Unlimited, Steam or Motor Vessel of any Gross Tons, issued by the United States Coast Guard. Captain Radtke's license must be renewed every five years. To maintain his license, Captain Radtke must attend fee-based training courses and satisfy certain experience-based service requirements completed while serving on active vessels.

7.      Plaintiff OMSA is the leading association of and spokesman for the offshore marine transportation service industry in the United States. Its more than 170 member companies include approximately 100 firms that own, operate, crew, and in some cases, build Jones Act qualified marine service vessels. These sophisticated vessels, approximately 1,200 in number, connect America with its offshore energy resources, providing transportation for workers and materials to and from those facilities. In addition to its members that own and operate vessels, OMSA's associate members include shipyards, surveyors, vessel equipment manufacturers and distributors, training providers, financial institutions, attorneys, and accountants. OMSA fosters, develops, and promotes ideas that advance the common good and the interest of its members with governmental and regulatory bodies in the United States and across the globe.

8.      Plaintiff SCA is an association whose mission is to support and promote the American shipyard industry—including shipbuilders, ship repairers, and the associated supplier

base—by providing strategic information and expertise for our membership and advocating on their behalf before Congress, the Executive Branch, and the media. SCA members constitute the shipyard industrial base that builds, repairs, maintains and modernizes U.S. Navy ships and craft, U.S. Coast Guard vessels of all sizes, as well as vessels for other U.S. government agencies. In addition, SCA members build, repair and service America's fleet of commercial vessels, including vessels owned and operated by OMSA members. SCA represents 41 companies that own and operate over 120 shipyards, with facilities on all three U.S. coasts, the Great Lakes, the inland waterways system, Alaska, and Hawaii. SCA's members employ approximately 100,000 direct shipyard workers.

9.      Defendant CBP is a component of the Department of Homeland Security, 6 U.S.C. § 211(a), and an "agency" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).  The unlawful "letter rulings" were issued by CBP, and CBP has the statutory authority to revoke the letter rulings.

10.      Defendant Kevin K. McAleenan is the Acting Commissioner of CBP and is the "head" of CBP.  6 U.S.C. § 211(b)(1).  Defendant McAleenan is sued in his official capacity as Acting Commissioner of CBP.

## Jurisdiction and Venue

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. There exists between the parties an actual and justiciable controversy in which Plaintiffs seek declaratory and injunctive relief to protect their legal rights.

12.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e)(1) because defendants reside in the District of Columbia.

**The Jones Act**

13.     Since 1789, Congress has made clear the importance to the United States of maintaining a fleet of seafaring vessels sufficient to protect our Nation's military and economic security. *See* An Act For Laying A Duty on Goods, Wares, and Merchandises Imported Into the United States, 1 Stat. 22 (1789); An Act for Registering and Clearing Vessels, Regulating the Coasting Trade, and For Other Purposes, 1 Stat. 55 (1789). As part of this national strategy, Congress has "encourage[d] the development of American merchant shipping." *Lake Tankers Corp. v. Henn*, 354 U.S. 147, 150 (1957).

14.     In 1920, Congress enacted the Merchant Marine Act, commonly referred to as the Jones Act. Pub. L. No, 66-261, 41 Stat. 988 (1920) (codified at 46 U.S.C. § 50101 *et seq.*).

15.     Congress stated in the Jones Act that "[i]t is the policy of the United States to encourage and aid the development and maintenance of a merchant marine." 46 U.S.C. § 50101(b).

16.     More specifically, Congress proclaimed that it "is necessary for the national defense and the development of the domestic and foreign commerce of the United States" to "have a merchant marine":

> (1) sufficient to carry the waterborne domestic commerce and a substantial part of the waterborne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of the waterborne domestic and foreign commerce at all times;
>
> (2) capable of serving as a naval and military auxiliary in time of war or national emergency;
>
> (3) owned and operated as vessels of the United States by citizens of the United States;
>
> (4) composed of the best-equipped, safest, and most suitable types of vessels constructed in the United States and manned with a trained and efficient citizen personnel and

> (5) supplemented by efficient facilities for building and repairing vessels.

46 U.S.C. § 50101(a).

17.     This case concerns the Jones Act's core requirement, which limits the privilege of transportation of merchandise between two U.S. points—either directly or via a foreign port—to U.S.-flagged ships, built in the U.S., owned by U.S. citizens, and crewed by U.S. citizens and/or permanent residents. Such transportation is commonly referred to as "coastwise transportation" and laws governing such transportation, including the Jones Act, are referred to as "coastwise laws."

18.     Under the Jones Act, "a vessel may not provide **any part** of the transportation of merchandise by water, or by land and water, between points in the United States to which the coastwise laws apply, either directly or via a foreign port, unless the vessel" "is wholly owned by citizens of the United States for purposes of engaging in the coastwise trade" and "has been issued a certificate of documentation with a coastwise endorsement under chapter 121 [of Title 46]." 46 U.S.C. § 55102(b) (emphasis added). To receive a coastwise endorsement, the vessel must also have been built in the United States. Two statutory phrases in § 55102(b) warrant particular attention.

19.     *First*, the Jones Act applies to transportation of merchandise "between points in the United States to which the coastwise laws apply." 46 U.S.C. § 55102(b).

(a)     The Outer Continental Shelf Lands Act ("OCSLA") establishes that the subsoil and seabed of the Outer Continental Shelf ("OCS") must be treated as "points in the United States" for Jones Act purposes:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the

> seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State.

43 U.S.C. § 1333(a)(1).

(b)     The Jones Act therefore applies to the subsoil and seabed of the OCS, as well as to installations permanently or temporary attached to the seabed for the purpose of resource activities.

(c)     The "[O]uter Continental Shelf" is defined as "all submerged lands lying seaward and outside of the area of lands beneath [statutorily-defined] navigable waters … and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a). Large portions of the Gulf of Mexico are part of the OCS.

20.     *Second*, the Jones Act applies to the transportation of "merchandise." 46 U.S.C. § 55102(b).

(a)     Under the general customs laws, Congress defined the term "merchandise" broadly as "goods, wares, and chattels of every description, … includ[ing] merchandise the importation of which is prohibited, and monetary instruments." 19 U.S.C. § 1401.

(b)     Congress views the "merchandise" covered by the Jones Act expansively. For example, in 1988, in response to a federal court decision holding that New York's sewage was not "merchandise" under the Jones Act, *see 106 Mile Transport Assoc. v. Koch*, 656 F. Supp. 1474 (S.D.N.Y. 1987), Congress swiftly moved to amend the statute to clarify that its expansive definition of "merchandise" under the Jones Act includes even "valueless material" and government property. Pub. L. No. 100-329, § 1(a)(2), 102 Stat. 588, 588 (1988) (now codified at 46 U.S.C. § 55102(a)(2)).

(c)     Likewise, Congress has been parsimonious in permitting exceptions from the broad reach of "merchandise."  In amendments to the Jones Act, referred to as "provisos," Congress has at times excluded particular articles from the statute's coverage, so as to allow their coastwise transportation by a foreign vessel.  The provisos are limited and conditioned.  For instance, container boxes, which are temporarily off-loaded by a foreign vessel at a U.S. point and later recovered by the same or a subsequent vessel for movement to another U.S. location, are expressly and specifically exempted from the Jones Act, but only if the nation of vessel ownership provides reciprocal privileges to U.S. flag vessels. Absent this Congressional "proviso," container boxes, would be considered merchandise (and, in fact, are subject to the Jones Act if the U.S. does not receive reciprocal privileges from the vessel's nation of ownership). *See* 46 U.S.C. § 55107(a); *see also id.* § 55105(b) (hazardous waste exception); *id.* § 55108 (exception for platform jackets); *id.* § 55113 (exception for oil spill response vessels). These limitations can only be necessary if the term "merchandise" has a *broad* scope. By necessary implication, the scope of these textual exceptions command that in their absence, all such articles would be covered as merchandise under the Jones Act.

21.     In sum, the laws of the United States—including the Jones Act—apply to the OCS. As such, the subsoil and seabed of the OCS, as well as installations permanently or temporarily attached to the seabed, are coastwise points under the Jones Act. Therefore, any part of the transportation of "merchandise"—as broadly defined in the statute—from a port of the United States to a point on the OCS (or vice versa or between two points on the OCS) must be performed by a Jones Act-qualified vessel with a U.S. crew.

## CBP's Interpretive Authority

22.     CBP has specific statutory authority to issue prospective interpretive rulings for individual transactions under the Jones Act. *See* 19 U.S.C. §§ 1502, 1625(a); *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001). These interpretive guidance documents are typically referred to as "letter rulings."

23.     A letter ruling "represents the official position of the Customs Service with respect to the particular transaction or issue described therein and is binding on all Customs Service personnel." 19 C.F.R. § 177.9(a). In addition, a letter ruling that has not been revoked or modified "may be cited as authority in the disposition of transactions involving the same circumstances," *id.*, or in the disposition of "substantially identical transactions." 19 U.S.C. § 1625(c). In other words, the letter rulings are binding on CBP when CBP considers a "substantially identical transaction[]" until CBP revokes or modifies its prior letter ruling through the notice-and-comment procedure specified in Section 1625(c).

24.     CBP letter rulings are a type of "interpretive rule." *See Mead*, 533 U.S. at 232-33. As the Supreme Court recently explained, "interpretive rules … are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (internal quotation marks and citation omitted).

25.     Letters rulings, like other interpretive rules, "respond to transactions of the moment" and "are not subject to notice and comment before being issued." *Mead*, 533 U.S. at 234.

26.     Because they are interpretive rules, letter rulings are not entitled to *Chevron* deference. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984) (explaining that an

agency's interpretation of an ambiguous statute should be upheld if it is reasonable). Rather, letter rulings are entitled to "respect proportionate to [their] 'power to persuade.'" *Mead*, 533 U.S. at 235 (quoting *Skidmore v. Swift & Co.*, 232 U.S. 134, 140 (1944)). As the Supreme Court explained in a seminal administrative law case, a letter ruling is to be judged based on the agency's "thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." *Mead*, 533 U.S. at 235. And, of course, a letter ruling cannot override unambiguous statutory language. *See id.* at 227; *Chevron*, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

27.     Thus, if a letter ruling is contrary to the statute's plain text and the expressed intent of Congress, or found unpersuasive by the court, it will be invalidated as arbitrary and capricious. *See Horizon Lines, LLC v. United States*, 414 F. Supp. 2d 46 (D.D.C. 2006) (invalidating letter rulings as contrary to the Jones Act).

28.     Congress subjected CBP's letter rulings to unique procedural requirements that do not apply to other interpretive rules under the Administrative Procedure Act ("APA"). Agencies may ordinarily revoke or modify an interpretive rule without the notice-and-comment procedures set forth in the APA. *See Perez*, 135 S. Ct. at 1203-04. But—even though CBP is not required to, and does not, utilize notice-and-comment procedures before issuing a letter ruling—CBP is required by statute to follow a prescribed notice-and-comment procedure if it intends to "modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days" or "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions." *See* 19 U.S.C. § 1625(c) (requiring publication in the Customs Bulletin, a minimum of thirty days for public

comment, and a sixty-day delay for effectiveness following issuance of the final letter ruling).

Thus, unlike a normal interpretive rule under the APA, a letter ruling issued by CBP must be

revoked and/or modified via the notice-and-comment procedures established by Congress in 19

U.S.C. § 1625(c). *See California Indus. Prods. v. United States*, 436 F.3d 1341, 1356 (Fed. Cir.

2006).

29.     Congress has also provided a special process for appealing CBP actions involving

letter rulings. Under 19 U.S.C. § 1625(b), parties may "appeal an adverse interpretive ruling and

any interpretation of any regulation to implement such ruling to a higher level of authority within

the Customs Service for de novo review."

### CBP's Unlawful Letter Rulings – Merchandise and Vessel Equipment

30.     At the request of foreign owners of vessels or companies that wish to charter such

vessels for OCS transportation activities, CBP has issued numerous letter rulings that are directly

contrary to the Jones Act's text, structure, and purpose.

31.     Notwithstanding the Jones Act's application and prohibition, a series of CBP's

interpretations has allowed foreign built, owned, flagged and crewed vessels to transport

merchandise between U.S. points, including points on the OCS, in clear violation of the Jones

Act.

32.     CBP's unlawful interpretations of the Jones Act have stifled investment by U.S.

shipping companies and diverted business away from Jones Act qualified vessels, the shipyards

that build them, and the mariners and other personnel responsible for their operation.  These

unlawful letter rulings fall into several categories.

33.     ***Ancillary Activities and Other CBP-Created Loopholes***.  Even though Congress

has expressly forbidden foreign-flagged ships from undertaking "any part" of the transportation

of merchandise by water between coastwise points, CBP has issued a series of rulings permitting foreign vessels to transport merchandise between U.S. points if they *also* engage in ancillary activities that are not regulated by the Jones Act.

34.     In HQ 101925 (also known as T.D. 78-387) issued on October 7, 1976, CBP approved the use of a foreign-built vessel to primarily support dive operations "in the construction, maintenance, repair, and inspection of offshore petroleum-related facilities." As part of that letter ruling, CBP permitted the foreign-built vessel to transport pipeline connectors, pipe and repair materials, wellhead equipment, valves, and valve guards from the U.S. mainland to a point on the OCS. That merchandise was then installed on the OCS. In short, HQ 101925 allows substantial amounts of merchandise to be transported and installed on the OCS by foreign-flagged vessels, even though the OCS is a coastwise point under the Jones Act and OCSLA.

35.     CBP has applied—and extended—the flawed reasoning of HQ 101925 on multiple occasions to allow the transportation of other kinds of merchandise to points on the OCS. For instance, CBP has issued letter rulings permitting foreign-flagged vessels to transport repair materials that are expended during the course of an underwater inspection and to transport *de minimis* amounts of wellhead equipment, valves and valve guards. These letter rulings are contrary to the plain language and purpose of the Jones Act. In these letter rulings, CBP has created unlawful loopholes in direct contravention of the Jones Act's congressionally defined scope. *See* HQ 108223 (Mar. 13, 1986); HQ 108442 (Aug. 13, 1986); HQ 113838 (Feb. 25, 1997); HQ 115185 (Nov. 20, 2000); HQ 115218 (Nov. 30, 2000); HQ 115311 (May 10, 2001); HQ 115522 (Dec. 3, 2001); HQ 15771 (Aug. 19, 2002); *see also See* Proposed Modification and Revocation of Ruling Letters Relating to Customs Application of the Jones Act to the

Transportation of Certain Merchandise and Equipment between Coastwise Points, 51 Cust. B. & Dec. No. 3, at 4 (Jan. 18, 2017) ("2017 Notice") (attached as Exhibit A) (collecting citations).

36.     ***Merchandise and Vessel Equipment***.   Next, CBP has issued letter rulings that improperly narrow the definition of "merchandise" that must be transported by Jones Act qualified vessels.

37.     By its plain language, the Jones Act applies to the transportation of "merchandise" and defines that term with broad, sweeping language. 46 U.S.C. § 55102(b); *see* paragraphs 17-21, *supra* (discussing statutory definitions of merchandise).   Despite this clear statutory command, CBP has interpreted and applied "merchandise" in an unlawfully narrow fashion, labeling as "vessel equipment" exempt from the Jones Act large categories of articles that are transported by a vessel from a port and left behind on the OCS as part of the oil field.

38.     CBP's general distinction between "merchandise" and "vessel equipment" derives from Section 309 of the Tariff Act of 1930, 19 U.S.C. § 1309, which exempts from customs duties certain "supplies" and "equipment" that are used on domestic vessels and aircraft.

39.     CBP's definition of vessel equipment for Jones Act purposes was initially based on T.D. 49815(4), issued in 1939 in connection with Tariff Act interpretations for duties. In that tariff-based interpretive rule, CBP set forth a reasonable interpretation of vessel equipment:

> The term 'equipment,' as used in section 309, as amended, includes portable articles *necessary and appropriate for the navigation, operation or maintenance of the vessel and for the comfort and safety of the persons on board*. It does not comprehend consumable supplies either for the vessel and its appurtenances or for the passengers and the crew. The following articles, for example, have been held to constitute equipment: rope, sail, table linens, bedding, china, table silverware, cutlery, bolts and nuts.

T.D. 49815(4) (Mar. 13, 1939) (emphasis added).

40.     CBP subsequently applied T.D. 49815(4) to vessel equipment activities involving the Jones Act. Over the years, however, at the behest of foreign vessel owners or their charterers seeking to reclassify merchandise as "vessel equipment," CBP unreasonably and unlawfully expanded the concept of "vessel equipment" it historically used to also include anything that the vessel carries as part of its "mission".  Based on this erroneous analysis, CBP held that "certain articles to be installed [on the OCS], *e.g.*, multi-well templates, marine risers, oilfield equipment, and structural components, are vessel equipment," *id.*, even though those articles serve no function on the vessel and are delivered to and left by the vessel at points on the OCS.

41.     CBP has adopted this unlawful and overly expansive definition of vessel equipment in numerous letter rulings. *See* HQ 105644 (June 7, 1982); HQ 110402 (Aug. 18, 1989); HQ 111892 (Sept. 16, 1991);  HQ 111889 (Feb. 11, 1992); HQ 112218 (July 22, 1992); HQ 113841 (Feb. 28, 1997); HQ 114305 (Mar. 31, 1998); HQ 114435 (Aug. 6, 1998); HQ 115333 (Apr. 27, 2001); HQ 115381 (June 15, 2001); HQ 115487 (Nov. 20, 2001); HQ 115938 (Apr. 1, 2003); HQ 116078 (Feb. 11, 2004); HQ H004242 (Dec. 22, 2006); HQ H029417 (June 5, 2008); HQ H032757 (July 28, 2008); *see also* 2017 Notice at 5-6 (collecting citations).

### CBP Acknowledged Its Letter Rulings Are Contrary To The Jones Act And Twice Instituted Section 1625(c) Notice-and-Comment Proceedings To Revoke Them

42.     Since 2009, CBP has acknowledged that a number of its letter rulings violate the Jones Act because they permit foreign-flagged vessels to perform transportation services that the Jones Act limits to U.S.-flagged vessels.

43.     In July 2009, CBP initiated a Section 1625(c) process to revoke and/or modify numerous letter rulings that were contrary to the Jones Act. As CBP candidly explained:

> CBP recognizes that allowing a foreign-flagged vessel to transport articles that are not needed to navigate, operate, or maintain that vessel or for the safety and comfort of the persons on board that vessel, but

> rather to accomplish a[n] activity for which that vessel would be engaged, would be contrary to the legislative intent of [the Jones Act].
>
>     \*       \*       \*
>
> CBP recognizes that allowing foreign-flagged vessels to transport merchandise from one U.S. point and install that merchandise at another point on the OCS on the condition that it merely be accomplished 'on or from that vessel' would be contrary to the legislative intent of [the Jones Act]."

Proposed Modification and Revocation of Ruling Letters Relating to the Customs Position on the Application of the Jones Act to the Transportation of Certain Merchandise and Equipment between Coastwise Points, 43 Cust. B. & Dec. No. 28, at 61 (July 17, 2009) (attached as Exhibit B) ("2009 Notice").

44.    CBP also stated its intent to modify HQ 101925 and the definition of "merchandise [that] may be transported between coastwise points without violating [the Jones Act]." *Id.* at 56; *see also id.* at 56-59 (discussing proposed modifications to HQ 101925).

45.    CBP failed, however, to revoke the unlawful letter rulings. On September 15, 2009, at the urging of foreign vessel owners and charterers of vessels who were benefiting from CBP's unlawful opinions, CBP concluded the Section 1625(c) proceedings without modifying or revoking any letter rulings, labeling that decision as a "withdrawal" of the notice to study the issue further. *See* Withdrawal of Proposed Modification and Revocation of Ruling Letters Relating to the Customs Position on the Application of the Jones Act to the Transportation of Certain Merchandise and Equipment between Coastwise Points, 43 Cust. B. & Dec. 1 (Customs), 2009 WL 3175038 (Sept. 15, 2009) ("2009 Withdrawal").  CBP stated in the 2009 Withdrawal that it would issue a new notice in the "near future."

46.    Following the 2009 Withdrawal, CBP and OMSA discussed how to bring CBP's opinions on OCS activities into compliance with the Jones Act. Because CBP had acknowledged in the 2009 Notice that its letter rulings were not compliant with the Jones Act, OMSA members

began investing in the construction or upgrading of U.S.-flag ships that could perform the kind of transportation described in the CBP letters that were targeted for revocation or modification by the 2009 Notice. Over $2 billion has been invested by OMSA members so far.

47.     In addition, subsequent to 2009, CBP encouraged OMSA to provide CBP with documented violations of the Jones Act, which OMSA did on several occasions between 2011 and 2016.  Despite these submissions, CBP failed to enforce Jones Act violations involving OCS operations.

48.      On January 22, 2016, OMSA, at the request of CBP, specifically identified five letter rulings and requested that CBP revoke or modify these letter rulings permitting activities that violate the Jones Act. Throughout 2016, CBP advised OMSA that it would study whether the letter rulings identified by OMSA should be revoked or modified.

49.     Late in 2016, in response to a documented violation provided by OMSA to CBP, CBP informed OMSA, for the first time in writing, that it could not take enforcement action because the offending activity was covered by an unrevoked letter ruling, making it clear to OMSA that enforcement of the Jones Act would never occur unless and until erroneous letter rulings were revoked.

50.     On January 18, 2017, at the urging of OMSA and others, and in apparent recognition that non-compliance with the Jones Act by foreign vessels engaged in OCS transportation activities was extensive, documented, and harmful to U.S. citizens, CBP issued a new Section 1625(c) notice, this time stating its intention to revoke or modify 25 letter rulings inconsistent with the Jones Act (2017 Notice at 1), including the five letter rulings identified by OMSA.

51.     In the 2017 Notice, CBP acknowledged its flawed interpretation with respect to the OCS in HQ 101925. According to CBP, the letter rulings based on HQ 101925 "are no longer applicable due to amendments made to 46 U.S.C. § 55102 (formerly 46 U.S.C. App. 883), the Outer Continental Shelf Lands Act, and 19 C.F.R. § 4.80b(a)." 2017 Notice at 3 (footnote omitted).

52.     CBP acknowledged in the 2017 Notice that it had created wholesale exceptions to the Jones Act that were not found in the statute and recognized that the only exceptions to the statute were those legislated by Congress in the provisos:

> The statute does not provide exceptions for certain activities.  It does not state that if the activity the vessel is engaged in does not constitute coastwise trade then the transportation of the merchandise in order for the vessel to engage in such activity does not violate 46 U.S.C. § 55102.  While there are statutory provisions exempting vessels engaging in certain transportation from the applicability of 46 U.S.C. § 55102, provided certain conditions are met, those provisions cover specific transportation scenarios not contemplated by this ruling.  See 46 U.S.C. §§ 55106-55108; 55115-44117, 55119 and 55121.

2017 Notice at 15.

53.     Moreover, in the 2017 Notice, CBP repeatedly admitted that numerous determinations in HQ 101925 are inconsistent with the Jones Act. For example:

> [T]he holding [regarding pipe and repair materials] is contrary to the plain meaning of 46 U.S.C. § 55102, as amended … . [T]he statute does not state that if the activity the vessel is engaged in does not constitute coastwise trade then the transportation of the merchandise in order for the vessel to engage in such activity does not violate 46 U.S.C. § 55102.

2017 Notice at 15.

54.     And, regarding a purported loophole for unforeseeable operations:

> [T]he rationale is contrary to 46 U.S.C. § 55102 … . The statute does not condition the transportation of merchandise upon whether the merchandise is a "preventative substance" or whether the

merchandise being installed is an "intrinsically foreseeable" operation.

2017 Notice at 15-16.

55.     CBP also properly recognized that there is no exception in the Jones Act for the transportation of pipeline connectors that is incidental to another operation, stating: "the holding in HQ 101925 creates an exception to 46 U.S.C. § 55102 that is inconsistent with the statute." 2017 Notice at 16. Revoking HQ 101925 would also have closed the even-broader loophole that had been created for pipeline connectors generally, even when not incidental. *See* HQ 108223 (Mar. 13, 1986); HQ 108442 (Aug. 13, 1986); HQ 113838 (Feb. 25, 1997); HQ 115185 (Nov. 20, 2000); HQ 115218 (Nov. 30, 2000); HQ 115311 (May 10, 2001); HQ 115522 (Dec. 3, 2001); HQ 15771 (Aug. 19, 2002).

56.     The 2017 Notice also proposed revoking letter rulings allowing the transportation of repair materials which are expended during the course of underwater inspection and repairs. CBP stated:

> [T]he language of 46 U.S.C. § 55102 prohibits the transportation of merchandise between points embraced by the coastwise laws, regardless of whether the merchandise is "necessary for the accomplishment of the mission of the vessel," "incidental to the vessel's operations," or "expended" during the course of the repair.

2017 Notice at 16.

57.     Regarding a drilling platform, the 2017 Notice targeted as erroneous letter rulings distinguishing between merchandise laden (i.e., loaded) on the underwater portion versus the topside of the drilling platform.   The 2017 Notice states plainly: "[t]he OCSLA does not distinguish between different parts of an installation.   A coastwise point embodies the entire structure, not just parts of it." 2017 Notice at 17.

58.     CBP also proposed to revoke letter rulings that purported to create an exemption from the Jones Act "de minimis" amounts of merchandise, stating: "[t]he foregoing holding is inconsistent with the plain language of 46 U.S.C. § 55102 which includes "valueless material" in its definition of merchandise." 2017 Notice at 17.

59.     CBP further proposed to revoke letter rulings stating that damaged pipe retrieved "incidental to a pipeline repair operation" could be transported by a non-coastwise qualified vessel, because "such language is inconsistent with 46 U.S.C. § 55102." 2017 Notice at 18.

60.     CBP next proposed to revoke the holding that the transportation of wellhead equipment, valves and valve guards from a U.S. point to a wellhead assembly that is a coastwise point pursuant to the OCSLA would not be prohibited by the coastwise laws if they are of *de minimis* value or necessary to accomplish unforeseen repairs or adjustments and are usually carried aboard the work barge as supplies.   The 2017 Notice recognized the "value of the merchandise is irrelevant to a determination that a coastwise transportation of merchandise has taken place and is contrary to the plain language of the statutory definition of merchandise which includes valueless material." *Id.*

61.     In addition to its recognition of the legal flaws of HQ 101925 and related letter rulings, CBP acknowledged its unlawful applications of T.D. 49815(4)'s definition of vessel equipment. CBP stated that the "in furtherance of the mission" standard had been improperly "expanded" and "used out of context." 2017 Notice at 5. CBP also stated that "these rulings do not comport with our proposed interpretation of the effect of 46 U.S.C. § 55102." *Id.* at 5.

62.     CBP thus recognized that articles, such as oilfield equipment, which are loaded onto a vessel at one point in the U.S. and then unloaded (i.e., unladen), installed and left behind by a vessel on the seabed or structures of the OCS, are not equipment of the vessel, but instead

must be categorized as merchandise. It recognized that these letter rulings' interpretations of what qualifies as vessel equipment—and therefore what is not merchandise—are unlawful given (1) the broad scope of the Jones Act definition of merchandise, (2) the common sense notion that vessel equipment does not include articles transported to and unloaded on the seabed or structures of the OCS, and (3) creation of such an obvious, massive loophole that Congress never authorized.

63.     The 2017 Notice was CBP's second acknowledgment that it has strayed far from the text of the Jones Act.  When coupled with CBP's acknowledgment that the text of the Jones Act cannot be enforced while erroneous letter rulings remain in place, the upshot is that revocation of the erroneous letter rulings is necessary to effectuate Congress's intent.

64.     On April 17, 2017, OMSA submitted a comment letter endorsing CBP's proposed revocation and/or modification of the unlawful letter rulings. OMSA provided CBP with detailed information about the ongoing use of foreign-flagged in the Gulf of Mexico to transport merchandise between coastwise points and the associated harms inflicted upon the U.S. maritime industry from that activity. Letter from Aaron C. Smith, President and CEO of OMSA, to Glen E. Vereb, Director, Border Security and Trade Compliance Division of CBP (Apr. 17, 2017) ("2017 Comments") (attached as Exhibit C).  OMSA's letter was supported by additional letters and comments provided by several OMSA members, many of which have invested in the construction of new vessels to perform the OCS transportation activities covered by CBP's erroneous letter rulings.

65.     As could be expected, objections to CBP's proposed action were lodged by those that stood to gain the most from maintaining the status quo, namely, the foreign owners and charterers of vessels who were benefiting from CBP's unlawful opinions.

66.     Once again, succumbing to the pressure of those vested interests, CBP did not revoke or modify the unlawful letter rulings. On May 3, 2017, reminiscent of its 2009 Withdrawal, CBP issued a notice stating that, "[b]ased on the many substantive comments [it] received," it needed "further research on the issue" and was therefore "reconsider[ing]" whether to withdraw and/or revoke the letter rulings identified in the 2017 Notice. Withdrawal of Proposed Modification and Revocation of Ruling Letters Relating to Customs Application of the Jones Act to the Transportation of Certain Merchandise and Equipment between Coastwise Points, 51 Cust. B. & Dec. No. 19, at 11 (May 10, 2017) (attached as Exhibit D).

67.     In other words, despite CBP's sustained acknowledgment that its letter rulings flout the Jones Act, those letter rulings continue to preclude enforcement of the Jones Act to the detriment of the U.S. domestic maritime industry.

**OMSA's Section 1625(b) Appeal**

68.     On June 13, 2017, OMSA filed an appeal, pursuant to Section 1625(b), challenging CBP's decision not to revoke or modify the letter rulings identified in the 2017 Notice. Letter from Aaron C. Smith, President and CEO of OMSA, to Kevin K. McAleenan, Acting Commissioner of CBP (June 13, 2017) ("Section 1625(b) Appeal Letter") (attached as Exhibit E).  OMSA stated that the letter rulings identified by CBP in the 2017 Notice unlawfully interpreted the Jones Act by permitting foreign-flagged vessels to transport merchandise between coastwise points. OMSA specifically argued that CBP letter rulings purported to create loopholes in the statute that Congress did not enact, and that CBP's definition of vessel equipment was unlawfully expansive. It explained that OMSA members that rely upon proper enforcement of the law are harmed by CBP's failure to revoke letter rulings that allow non-Jones Act qualified vessels to operate without legal consequences.

69.     CBP must respond to an appeal within sixty days if the appealing party shows business necessity.  *See* 19 U.S.C. § 1625(b).  In its appeal, OMSA demonstrated business necessity given the ongoing work performed by foreign-flagged ships in the Gulf of Mexico and the harm inflicted on its members by CBP's affirmative refusal to revoke the letter rulings. OMSA filed its appeal on June 13, 2017, and thus a response was due by August 12, 2017.  CBP has not responded to OMSA's appeal.  That failure to respond within the statutory deadline effectively denies OMSA's appeal.

### CBP's Refusal To Revoke The Unlawful Letter Rulings Harms Plaintiffs And Their Members

70.     CBP's decision not to revoke the unlawful letter rulings allows foreign-flagged vessels to continue to perform substantial amounts of work in the Gulf of Mexico in clear violation of the Jones Act and thus inflicts significant harm on Plaintiffs as well as OMSA's and SCA's members. If CBP had revoked the unlawful letter rulings, that work would be handled by U.S.-flagged vessels and U.S. mariners—and the owners of those vessels are OMSA members. In fact, days after the CBP announcement of its withdrawal, an OMSA member that had previously been awarded a job for OCS transportation work with its Jones Act qualified vessel, was informed by its customer that the work would instead be performed by a foreign vessel.

71.     The United States has significant oil and natural gas reserves on the OCS in the Gulf of Mexico. In January 2017, Gulf of Mexico crude oil production was 1.7 million barrels per day. *See* U.S. Energy Information Administration, *Gulf of Mexico Crude Oil Production, Already at Annual High, Expected to Keep Increasing*, Apr. 12, 2017, https://www.eia.gov/todayinenergy/detail.php?id=30752. Offshore facilities in the Gulf of Mexico produce seventeen percent of total U.S. crude oil production and five percent of total

U.S. "dry" natural gas production. *See* U.S. Energy Information Administration, *Gulf of Mexico Fact Sheet*, https://www.eia.gov/special/gulf_of_mexico/.

72.     This substantial energy production requires numerous support vessels in the Gulf of Mexico. OMSA's members that own or operate offshore vessels employ roughly 12,000 crew members. One recent study found that offshore oil and gas activities help support some 6,000 companies in the United States and generate annual wages of $1.2 billion. *See* Offshore Marine Service Association, *Our Industry*, http://www.offshoremarine.org/cpages/our-industry (last visited Oct. 25, 2017).

73.     In the past few years, foreign-flagged vessels have operated with impunity in the Gulf of Mexico. In 2015 and 2016, after CBP asked OMSA to identify Jones Act violations, OMSA reported to CBP eighteen instances in which foreign-flagged vessels conducted transportation activities between a U.S. port and a point on the OCS. *See* Section 1625(b) Appeal Letter 4 & Exs. 2-3.

74.     For example, in November 2015, the foreign-flagged ship *MV Normand Clipper* (IMO: 9236200) was observed by OMSA members ladening merchandise in Mobile, Alabama. The *Normand Clipper* subsequently delivered and installed the merchandise at a coastwise point on the OCS near the Green Canyon Block in the Gulf of Mexico. *See* Section 1625(b) Appeal Letter Ex. 3.

75.     In July 2015, two foreign flagged vessels were observed violating the Jones Act. The foreign-flagged vessel *Olympic Boa* (also known as *MV Olympic Athene* and *MV Seabed Constructor*; IMO: 9682148) departed the port of Pensacola with merchandise that was loaded there and subsequently lowered onto the sea floor of the OCS using the vessel's crane. And the foreign-flagged vessel *Lewek Falcon* (IMO: 9448401) was observed loading concrete mats onto

its deck in Pensacola, which were subsequently lowered onto the OCS sea floor using the vessel's crane.

76. CBP responded to these requests by stating that it could not take any enforcement action against these Jones Act violators until the unlawful letter rulings were revoked and/or modified. Because the erroneous letter rulings bind CBP in "substantially identical transactions," 19 U.S.C. § 1625(c), CBP can only stop these clear violations of the Jones Act by revoking or modifying those rulings through the Section 1625(c) notice-and-comment process.

77. If CBP were to revoke the erroneous letter rulings, OMSA's members would be able to obtain contracts to handle the work performed by these foreign-flagged vessels. For instance, U.S.-flagged vessels would be the only vessels legally permitted to perform these transportation activities, decommissioning activities, and the transportation of nodes.

78. OMSA's members are capable of handling the coastwise trade in the Gulf of Mexico that has been unlawfully diverted to foreign-flag carriers and foreign workers by the letter rulings CBP proposed to revoke. But because of CBP's decision not to revoke or modify the erroneous letter rulings, OMSA's members do not receive many contracts for coastwise trade; rather, those contracts go to foreign-flagged vessels.

79. CBP's refusal to revoke the erroneous letter rulings is also harming OMSA's and SCA's members who engage in shipbuilding. In the past nine-years, over $2 billion has been invested by U.S. citizens to construct and/or convert thirty-one vessels. Section 1625(b) Appeal Letter at 4 & Ex. 1. Much of that investment occurred after CBP signaled in 2009 that it was re-considering the unlawful letter rulings. But if CBP continues to allow the unlawful letter rulings to stand, then there will be less demand for U.S.-built ships.

80.     Furthermore, CBP's refusal to revoke the erroneous letter rulings harms mariners, such as Plaintiff Paul Radtke. Captain Radtke holds a Master Unlimited license issued by the United States Coast Guard, which is the highest level of licensure issued by the Coast Guard and entitles him to operate any size vessel. As such, he is among the most senior and highest qualified licensed mariners in the United States.  To maintain his license, Captain Radtke must renew it every five years, participate in training, and log a requisite number of hours on a vessel. The ability of an Unlimited Licensed Mariner such as Captain Radtke to use his or her license aboard Jones Act qualified multi-purpose support vessels ("MPSVs") has been restricted as a result of CBP's erroneous letter rulings that authorize foreign vessels to perform coastwise transportation in the United States in violation of the Jones Act.  Foreign owners of MPSVs have not employed Unlimited Licensed Mariners on their ships, and U.S. owners of MPSV's lack opportunities for MPSV operations given the presence of foreign-flagged vessels that have been unlawfully authorized by CBP to perform coastwise transportation. Given CBP's erroneous letter rulings, it is more difficult for Captain Radtke to find employment on a Jones Act qualified vessel and maintain his license as an Unlimited Master.

81.     Finally, a recent economic analysis conducted by OMSA predicts that the revocation and modification of the erroneous letter rulings would create 3,200 jobs in the Gulf of Mexico, with $155 million in additional wages and $700 million in regional economic growth.

## FIRST CAUSE OF ACTION

### The Letter Rulings Identified in the 2017 Notice and Challenged in OMSA's

### Section 1625(b) Appeal Violate the APA, And CBP's Failure To Revoke Those Letter

### Rulings Violates The APA, 5 U.S.C. § 706(2)(A)

82.     Plaintiffs incorporate the allegations in Paragraphs 1-81 above.

83.     CBP has twice acknowledged—in July 2009 and in January 2017—that it has issued numerous letter rulings in violation of the Jones Act. CBP was correct in July 2009 and January 2017 that its letter rulings are contrary to the plain language and expressed intent of the Jones Act and the OCSLA.

84.     The letter rulings identified by CBP in the 2017 Notice and challenged by OMSA in its Section 1625(b) appeal are arbitrary, capricious, and abuses of discretion, and contrary to law. CBP's May 2017 decision not to revoke those letter rulings is arbitrary, capricious, an abuse of discretion and contrary to law. And CBP's denial of OMSA's appeal is arbitrary, capricious, an abuse of discretion, and contrary to law.

## SECOND CAUSE OF ACTION

### CBP's Denial of OMSA's Section 1625(b) Appeal Concerning Decommissioning Activities Violates the APA, 5 U.S.C. § 706(2)(A)

85.     Plaintiffs incorporate the allegations in Paragraphs 1-84 above.

86.     Once an offshore oil and gas "facility" no longer economically produces hydrocarbons, the operator acting pursuant to the lease is required under the terms of its lease agreement with the United States and applicable federal regulations to restore the sea-floor and the water surface by plugging and abandoning the well and removing the installation and facility. See 30 C.F.R. § 250.1701.

87.     A "facility" is defined by federal regulations as "any installation other than a pipeline used for oil, gas, or sulphur activities that is permanently or temporarily attached to the seabed on the OCS." *Id.* § 250.1700(c). A facility "include[s] production and pipeline risers, templates, pilings, and any other facility or equipment that constitutes an obstruction such as jumper assemblies, termination skids, umbilicals, anchors, and mooring lines." *Id.* § 250.1700(c).

88.     All of these articles constituted "merchandise" when they were laden in the United States and then unladen on the pristine seabed of the OCS. For that reason, the Jones Act requires that a U.S.-flagged vessel, crewed by U.S. citizens, must remove this merchandise from the pristine seabed of the OCS and carry it back to the United States.

89.     On April 6, 2016, OMSA requested a letter ruling that these decommissioning activities must be performed by Jones Act qualified vessels. Letter from Jim Adams, Executive Director of OMSA, to Lisa L. Burley, Office of Regulations and Rulings, CBP (Apr. 6, 2016) (attached as Exhibit F).

90.     On April 26, 2016, CBP rejected OMSA's request for a letter ruling, stating that OMSA's request was "hypothetical." Letter from Lisa L. Burley, Supervisory Attorney-Advisor/Chief, Cargo Security, Carriers, and Restricted Merchandise Branch of CBP, to Jim Adams, Executive Director, OMSA (Apr. 26, 2016) (attached as Exhibit G).

91.     On May 17, 2016, OMSA responded by letter to CBP's denial of its request. Letter from Jim Adams, Executive Director of OMSA, to Lisa L. Burley, Supervisory Attorney-Advisor/Chief, Cargo Security, Carriers, and Restricted Merchandise Branch of CBP (May 17, 2016) (attached as Exhibit H). In that letter, OMSA stated that its request was not hypothetical, pointing out the regulatory obligation to decommission offshore oil and natural gas facilities as well as on-going decommissioning work in the Gulf of Mexico. *Id.* at 2. Indeed, OMSA noted that foreign-flagged vessels were participating in decommissioning work as of May 2016. *Id.* at 2-3. OMSA further pointed out that CBP regularly issued letter rulings in similarly "hypothetical" situations. *Id.* at 4. CBP did not respond to this letter, and OMSA appealed, pursuant to Section 1625(b), CBP's decision not to issue a letter ruling. *See* paragraphs 68-69, *supra*.

92.     CBP's April 2016 decision not to issue a letter ruling in response to OMSA's request is arbitrary, capricious, an abuse of discretion, and contrary to law.

93.     By failing to act on OMSA's Section 1625(b) appeal, CBP missed the sixty-day statutory deadline for responding to an appeal where the appealing party has demonstrated a business necessity—and therefore has effectively denied OMSA's appeal.  CBP's denial of OMSA's decommissioning activities appeal is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### THIRD CAUSE OF ACTION

### HQ H205655 Violates the APA, 5 U.S.C. § 706(2)(A)

94.     Plaintiffs incorporate the allegations in Paragraphs 1-93 above.

95.     Nodes are devices for measuring seismic data. Nodes are deposited on the OCS by a support vessel and, while resting on the sea bed, record seismic data generated by the firing of "cannons" from the seismic-source vessel. The support vessel then retrieves the nodes to obtain the seismic recording and transports the nodes to their next location.

96.     Under a proper interpretation of the Jones Act, nodes are merchandise that are unladen at a coastwise point—the seabed of the OCS—and then retrieved, laden on the vessel, and taken to another coastwise point—another part of the OCS seabed. As OMSA explained in a letter sent to CBP, *see* Letter from Jim Adams, President and CEO, OMSA, to George F. McCray, Supervisor, OT-RR, CBP (Sept. 19, 2012) (attached as Exhibit I), OCSLA extends the laws of the United States to the "subsoil and seabed of the [O]uter Continental Shelf." 43 U.S.C. § 1333(a)(1); *see also* paragraphs 17-21, *supra* (discussing OCSLA); *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492, 496 (5th Cir. 2002) (Section 4(a)(1) of the OCSLA "applies to two primary sets of subject: 'to the subsoil and seabed of the [OCS]'; and 'to all artificial islands, and

all installations and other devices permanently or temporarily attached to the seabed.'"). And given that CBP has acknowledged that the Jones Act applies to structures on the OCS, it cannot deny the application of the Jones Act to the pristine seabed on the OCS. The Jones Act therefore requires that nodes be transported between points of the pristine seabed of the OCS by U.S.-flagged vessels.

97.     However, CBP determined in letter ruling HQ H205655 (Mar. 20, 2012) (attached as Exhibit J) that, under the Oceanographic Research Vessel Act ("ORV Act"), 46 U.S.C. § 2101(18), a foreign-flagged vessel that qualified as an "oceanographic research vessel" ("ORV") under the foreign country's laws may transport nodes from one point on the OCS to another.

98.     The ORV Act defines an "oceanographic research vessel" as "a vessel that the Secretary [of Homeland Security] finds is being employed only in instruction in oceanography or limnology, or both, or only in oceanographic or limnological research, including studies about the sea such as seismic, gravity meter, and magnetic exploration and other marine geophysical surveys, atmospheric research, and biological research." *Id.* The ORV Act also provides that vessels designated as ORVs by the Secretary of Homeland Security are "*deemed* not to be engaged in trade or commerce." 46 U.S.C. § 50503 (emphasis added). The Secretary of Homeland Security applies this standard for determining whether a *U.S.-flagged* ship should qualify as an ORV.

99.     In addition to these procedures for designating a U.S.-flagged ship as an ORV, the U.S. Coast Guard has inspection authority over foreign-flagged vessels under international reciprocity agreements. *See* 46 U.S.C. § 3303. If a vessel's country "is considered to have inspection laws and standards similar to those of the United States when it is a party to an

International Convention for Safety of Life at Sea," (otherwise know as "SOLAS") "[a] foreign certificate of inspection may be accepted as evidence of lawful inspection." *Id.*

100.    In issuing letter ruling HQ H205655, CBP improperly exempted foreign-flagged ORVs from the coastwise trade requirements of the Jones Act. Based on a reciprocal approval of the foreign country's certification that a vessel was an ORV, CBP unlawfully extended Section 50303's "deeming" provision—that a vessel certified as an ORV is deemed not to be engaged in trade or commerce and thus exempt from the Jones Act—to the foreign-flagged vessel. In other words, CBP allowed a foreign nation to determine whether its own vessel was engaging in trade or commerce and thus allowed that nation to exempt the vessel from the Jones Act's requirements.

101.    Nothing in the ORV Act's provision "deeming" ORVs to not engage in trade or commerce displaces the requirements imposed by the Jones Act on foreign-flagged vessels. Rather, CBP must engage in its own independent analysis of whether the foreign-flagged ORV's activities are subject to the Jones Act's requirements.

102.    CBP should have addressed whether placing and then moving nodes on the pristine seabed by a foreign-flagged vessel constituted a coastwise transportation. Given OCSLA's plain language, the pristine seabed of the OCS is a coastwise point and thus transportation of merchandise to the pristine seabed is covered by the Jones Act.

103.    When CBP issued HQ H205655, it unlawfully interpreted the Jones Act and the ORV Act. Under a proper reading of both statutes, and of the OCSLA, the pristine seabed is a coastwise point and nodes may only be transported from a point in the U.S. to a point on the OCS (or between two points on the pristine seabed of the OCS) by a U.S.-flagged vessel.

104.    HQ H205655 is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that the letter rulings identified in the 2017 Notice are in excess of CBP's statutory jurisdiction, authority, or limitations and short of statutory right in violation of 5 U.S.C. § 706(2)(A);

2.    Declare that the letter rulings identified in the 2017 Notice are unlawful and without any legal force and effect;

3.    Order CBP to revoke the letter rulings identified in CBP's 2017 Notice;

4.    Declare that CBP's refusal to issue a letter ruling concerning decommissioning activities, and its denial of the appeal of the failure to issue the letter ruling, are in excess of CBP's statutory jurisdiction, authority, or limitations and short of statutory right in violation of 5 U.S.C. § 706(2)(A), and are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(C);

5.    Declare that transportation of decommissioned equipment on the OCS from the OCS to another point in the United States is subject to the Jones Act;

6.    Order CBP to issue a letter ruling determining that such decommissioning transportation activities are subject to the Jones Act;

7.    Declare that HQ H205655 is in excess of CBP's statutory jurisdiction, authority, or limitations, and short of statutory right in violation of 5 U.S.C. § 706(2)(A);

8.    Declare that HQ H205655 is unlawful and without any legal force and effect;

9.    Order CBP to revoke HQ H205655;

10.     Award Plaintiffs its costs in this action, including its reasonable attorneys' fees incurred; and

11.     Award such other relief as the Court deems just and proper.


Respectfully submitted,


s/Andrew J. Pincus
Andrew J. Pincus (D.C. Bar. No. 370762)
Brian D. Netter (D.C. Bar. No. 979362)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000
(202) 263-3300 (fax)

Attorneys for Plaintiff

Dated:   November 9, 2017