# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAPTAIN PAUL RADTKE**, *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>**U.S. BUREAU OF CUSTOMS & BORDER PROTECTION**, *et al.*,<br><br>            Defendants.<br><br><br>**AMERICAN PETROLEUM INSTITUTE**,<br><br>            Intervenor-Defendant. | Civil Action No. 17-cv-2412 |

## MEMORANDUM OPINION

To have standing to sue, a plaintiff must seek relief for concrete harm. And to bring a claim under the Administrative Procedure Act ("APA"), the challenged agency action must be final. Both standing and finality are bars to judicial review because each prevents courts from prematurely interfering with agency decision-making. This case exemplifies that overlap may exist between the two, but one cannot be substituted for the other.

Plaintiffs, two shipping associations and a captain, sued Defendants Customs and Border Protection ("CBP"), and Peter Flores, CBP's Acting Commissioner (collectively, "Defendants" or "CBP"), in a 716-page Amended Complaint alleging APA violations. They claim that foreign shipping vessels currently enjoy more business than American vessels because CBP refuses to enforce the Jones Act in thirty of its letter rulings and subsequent agency actions. Plaintiffs allege that, as a result, they have suffered substantial financial losses.

Defendants move for judgment on the pleadings, arguing that Plaintiffs lack standing, the challenged actions are unreviewable, and the court should not grant further leave to amend.  Defs.' Mot. for J. on the Pleadings at 16–35, ECF No. 59-1 ("Defs.' Mot.").  Having considered the briefing, oral argument, and the record, the court concludes that Plaintiffs have competitor standing.  But because neither CBP's challenged letter rulings nor the related agency actions are final, the court will GRANT Defendants' Motion for Judgment on the Pleadings.  Accordingly, it will DISMISS Plaintiffs' claims without granting leave to amend because amendment would be futile.

## I.    BACKGROUND

### A.  Statutory and Regulatory Scheme

The Jones Act is a set of maritime commerce laws governing cargo transportation between any two points in the United States.  46 U.S.C. §§ 50101(a), (a)(3), 55102(b); Am. Compl. ¶¶ 1, 16, ECF No. 50.  One provision of the "coastwise laws" requires that merchandise be transported by American-made, flagged, owned, built, and crewed ships.  46 U.S.C. § 55102(b); Am. Compl. ¶ 19.  These are called "Jones Act qualified vessels."  *See* 46 U.S.C. § 55102(b).

CBP, the agency responsible for interpreting and enforcing the Jones Act, issues letter rulings that exempt the Act's application to five foreign vessel actions—transportation, lifting, pipe repair, decommissioning, and node transportation.  Am. Compl. ¶¶ 70–144.  CBP may issue these interpretive letter rulings under 19 U.S.C. §§ 1502, 1625(a); *United States v. Mead Corp*., 533 U.S. 218, 234 (2001) (discussing the legal authority of letter rulings).  Letter rulings apply the Jones Act "to a specific set of facts."  19 C.F.R. § 177.1(d).  They are issued in response to "written requests from importers and other interested parties" for a "specifically described transaction."  *Id*. § 177.1(a)(1).  Vessel-related ruling requests must include certain information about the vessel

involved, including the place of build and nationality of registration, and "the exact place or places of intended use, if known." *Id.* § 177.2(b)(2)(iv).

CBP's letter rulings provide its view of a "prospective transaction" before it is undertaken and completed. *Id.* § 177.2(b)(2)(ii)(B). Questions arising in connection with a "completed Customs transaction[] may not be the subject of a ruling request." *Id.* § 177.1(a)(2)(ii).

Generally, CBP only issues a letter ruling when requested to do so by a "person who . . . has a direct and demonstrable interest in the question or questions presented in the ruling request," *id.* § 177.1(c), when the prospective transaction is not "essentially hypothetical in nature," *id.* § 177.7(a), and when issuing a letter ruling would not be "contrary to the sound administration of the Customs and related laws," *id.* Once issued, a letter ruling constitutes CBP's "official position" on "the particular transaction or issue described therein and is binding on all Customs Service personnel." *Id.* § 177.9(a).

CBP must publish a letter ruling within 90 days of its issuance. 19 U.S.C. § 1625(a). Any entity with a "demonstrable interest in the" "ruling request," 19 C.F.R. § 177.1(c), "may appeal an adverse interpretive ruling . . . to a higher level of authority within the Customs Service for de novo review," and CBP must decide the appeal within 60 days. 19 U.S.C. § 1625(b).

Although CBP may issue letter rulings without adversarial proceedings or notice and comment, Congress imposes special procedures for CBP to change its past rulings. If CBP proposes an interpretive rule or decision that would "(1) modify . . . or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days"; or (2) "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions[,]" it must provide a notice and comment period. *Id.* §§ 1625(c)(1)–(2). "After

consideration of any comments received," CBP must "publish a final ruling or decision" no later than 30 days after the close of the notice and comment period. *Id.*

Importantly, because any letter ruling could be modified or revoked, the regulations provide that "no other person should rely on the ruling letter or assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter." 19 C.F.R. § 177.9(c).

### B. Plaintiffs' Administrative Challenges

Plaintiffs are two associations—the Offshore Marine Service Association (OMSA) and Shipbuilders Council of America (SCA)—and Captain Paul Radtke, who holds a U.S. Coast Guard vessel operating license. Am. Compl. ¶¶ 8–10. Plaintiffs, or their members, build, own, or operate Jones Act-qualified vessels. *Id.* In their Amended Complaint, Plaintiffs added two more causes of action for a total of five—all related to their claim that CBP violated the APA through a string of past letter rulings permitting certain foreign vessel activities.

In Count I, Plaintiffs challenge CBP's issuance of and failure to revoke twenty-five letter rulings identified in CBP's 2017 decision. Am. Compl. ¶ 187. They claim these letter rulings all use an "unlawfully broad definition" of vessel equipment, employ unlawful exemptions, and are "contrary to the plain language and expressed intent of the Jones Act and the [Outer Continental Shelf Lands Act]." *Id.*

In 2009, 2017, and 2019, CBP initiated Section 1625(c) proceedings, seeking notice and comment on whether it should revoke or modify some or all the challenged letter rulings. In 2009 and 2017, CBP decided to withdraw those proposals without further action after the close of the notice and comment periods. *Id.* ¶¶ 51–55. After CBP withdrew the proposals in 2017, OMSA sent a letter to Kevin K. McAleenan, the then-Acting Commissioner for CBP, challenging that decision under 19 U.S.C. § 1625(b). *See id.* ¶ 188. Plaintiffs claim CBP never responded to the

letter.  *Id.*  In 2019, CBP closed the notice-and-comment phase and modified several rulings, revoked others, and left the rest intact.  *Id.* ¶¶ 62–65, 189.

Plaintiffs allege in Count I that the twenty-five letter rulings related to vessel equipment, CBP's 2017 decision not to revoke the rulings, its failure to respond to OMSA's appeal, and CBP's 2019 decision to modify some rulings but leave in force others are "arbitrary, capricious, and abuse of discretion, and contrary to law."  *Id.* ¶ 191.

In Count II, Plaintiffs challenge CBP's denial of OMSA's request for a letter ruling concerning decommissioning activities.  *Id.* ¶¶ 193–96.  Decommissioning occurs when an oil rig operator abandons an offshore well, during which the operator will often use vessels to remove any remaining installations or facilities before plugging the well.  Am. Compl., Aries Marine Corp. Decl. ¶ 12, ECF No. 50-30 ("Aries Marine Corp. Decl.").  In early 2016, OMSA sought a letter ruling confirming that the Jones Act governed foreign vessels transporting material for decommissioning activities.  Am. Compl. ¶ 58.  CBP denied OMSA's request, finding it "hypothetical."  *Id.* ¶ 129.  The next year, OMSA challenged that denial—again under 19 U.S.C. § 1625(b)—along with CBP's 2017 withdrawal of its notice to modify or revoke past letter rulings.  *Id.* ¶¶ 60–61.  Plaintiff contends that both CBP's denial of the request for a letter ruling, as well as its failure to respond to the appeal letter, are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* ¶ 196.

In Count III, Plaintiffs challenge a 2012 CBP letter ruling, HQ 205655, regarding the transportation of "nodes"—devices for measuring seismic data on the seabed.  *Id.* ¶¶ 137, 197–99. In that letter ruling, CBP concluded that if a foreign vessel transporting nodes qualified under the foreign country's laws as an "oceanographic research vessel," then the Jones Act requirements did not apply.  *Id.* ¶¶ 138–41.  That determination, Plaintiffs argue, when read in conjunction with the

Oceanographic Research Vessel Act, 46 U.S.C. § 2101, and the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333, contravenes the Jones Act. *Id.* ¶¶ 198–99. OMSA requested that the letter be revoked, but CBP responded that it had "determined not to revoke [that letter] at [that] time." *Id.* ¶ 144 (internal quotation marks and citation omitted). Plaintiffs allege that CBP's rejection and the letter itself are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* ¶ 199.

In Count IV, Plaintiffs claim that CBP's 2019 decision failed to specify that the "paid out not unladen" doctrine "does not exempt" merchandise movement by foreign vessels "simply because that merchandise is attached to an item being paid out in pipeline installation and repair operations." *Id.* ¶ 201 (emphasis removed). OMSA requested clarification during the notice-and-comment period, and, after the request was denied, appealed the denial unsuccessfully. *Id.* ¶¶ 101–02. Plaintiffs contend that CBP's denials are "likewise arbitrary, capricious, an abuse of discretion, and contrary to law." *Id.* ¶ 203.

Finally, in Count V, Plaintiffs contend that CBP's 2019 decision was erroneous in two further respects: first, it revoked two "Koff Rulings," HQ H225102 and HW H235242, recognizing "that use of a foreign vessel to perform heavy lift operations would violate the Jones Act, because heavy lift operations require self-propelled lateral movement of a vessel while repositioning the topside." *Id.* ¶ 205. A vessel's topside, Plaintiffs argue, is a piece of merchandise and therefore a foreign vessel cannot alter it. Second, CBP's 2019 decision also redefined "transportation" under the Jones Act to exclude "any lateral movement of the vessel that is merely subordinate to and a direct consequence of the lifting operations." *Id.* ¶ 207 (internal quotation marks omitted). CBP rejected OMSA's request to reconsider both decisions through notice-and-comment and appeal.

*Id.* ¶ 208.  Plaintiffs claim that those actions are "likewise arbitrary, capricious, and abuse of discretion, and contrary to law."  *Id.* ¶ 209.

### C. Challenged Letter Rulings

Altogether, Plaintiffs challenge thirty of CBP's letter rulings, from 1976 to 2012.[1]  Compl. ¶¶ 186–209; Defs.' Mot. at 7–9.  They seek to revoke twenty-eight of the thirty letter rulings, Compl. at 61, and request reinstatement of HQ H225102 and HQ H235242, the two revoked Koff Rulings exempting short-distance heavy lift operations from Jones Act requirements.  *Id.* at 63.

Each of the letter rulings is fact- and party-specific.  The letters are typically issued from CBP headquarters and address only the parties requesting the letter ruling.  They generally contain four sections: facts, issue, law and analysis, and a holding.

For example, in 2008, Hannah Marine Corporation asked whether the Jones Act permitted it to use a non-coastwise-qualified barge as an exhibit hall.  Am. Compl., Ex. 11 at 30, ECF No. 50-11 ("Ex. 11").  The Chief of Cargo Security in CBP's Carriers and Immigration Branch responded that the "proposed use" was not an "engagement in coastwise trade" and therefore the "subject exhibit hall structure" did not violate the Jones Act.  *Id.* at 33.  In 2012, another company asked CBP to "determine whether the proposed lifting and installation operations" of a particular vessel would violate the Jones Act.  Am. Compl., Ex. 17 at 104, ECF No. 50-17 ("Ex. 17").  The Chief of Cargo Security in CBP's Carriers and Restricted Merchandise Branch Office of International Trade responded that the transportation "constitutes a violation of 46 U.S.C. § 55102."  *Id.* at 106.

---

[1] Plaintiffs do not challenge one letter ruling, HQ 115799, in their Amended Complaint.  Am. Compl. ¶¶ 1–209.  But they urged CBP to revoke that letter in their comment to CBP's 2019 notice, Am. Compl., Ex. 18 at 9 n.29, ECF No. 50-18 ("Ex. 18"), and explicitly request that all "letter rulings identified" in OMSA's 2019 Comments be declared unlawful.  Am. Compl. at 61.  The court therefore includes that letter in Plaintiffs' challenged agency actions.

### D.  Procedural History

On November 15, 2022, the court denied Defendants' first Motion for Judgment on the Pleadings and granted Plaintiffs' Motion for Leave to File an Amended Complaint.  ECF No. 48. On April 5, 2018, the court granted the American Petroleum Institute's Motion to Intervene on behalf of Defendants.  Apr. 5, 2018 Minute Ord.  On March 20, 2023, Defendants again moved for judgment on the pleadings.  ECF No. 59-1.  They challenge whether Plaintiffs have standing, and argue that even if they do, their claims are not reviewable.  Defs.' Mot. at 17–25, 37–39.  They also oppose Plaintiffs' request to file a second Amended Complaint.  *Id.* at 42–43.  On March 10, 2025, this court heard argument from the parties on whether Plaintiffs have standing, and whether Defendants' challenged actions have a legal effect on Plaintiffs.  ECF No. 68.

## II.       LEGAL STANDARD

### A.  Judgment on the Pleadings

"Very few of" the D.C. Circuit's precedents discuss judgment on the pleadings under Fed. R. Civ. P. 12(c), partly "because judgment on the pleadings is rare."  *Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 760 (D.C. Cir. 2019).  The Circuit has made clear that "the party seeking judgment on the pleadings shoulders a heavy burden."  *Id.*

On a motion for judgment on the pleadings, the court "accept[s] as true the allegations in the opponent's pleadings, and as false all controverted assertions of the movant," and affords "all reasonable inferences to the opponent's pleadings."  *Id.* at 761 (citations omitted).  And "judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery."  *Id.* (internal quotation marks and citation omitted).

### B.  Leave to Amend

A district court may dismiss a complaint without granting leave to amend.  *See Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 732–33 (D.C. Cir. 2021); *see also* Fed. R. Civ. P. 12(c), 15(a).

A court should deny leave to amend or supplement when granting the request would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). "An amended complaint is futile if it merely restates the same facts as the original complaint in different terms[.]" *McGee v. District of Columbia*., 646 F. Supp. 2d 115, 119 (D.D.C. 2009).

## III.    ANALYSIS

Defendants argue that Plaintiffs lack standing and that CBP's challenged actions are unreviewable. Defs.' Mot. at 17–25, 37–39. Because the court concludes that at least OMSA has associational standing, it finds that the other two Plaintiffs do as well. Nonetheless, because the court also concludes that each of Plaintiffs' challenged letter rulings, and CBP's 2019 decision, are nonfinal agency actions, Plaintiffs' five counts must be dismissed.

### A.    Associational Standing

As it must in every case, the court first addresses whether Plaintiffs have standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Plaintiffs do not specify whether they assert organizational or associational standing. Pls.' Mem. of Points & Auth. in Opp. to the Mot. for J. on the Pleadings at 29–40, ECF No. 61 ("Pls.' Opp'n"). But their standing arguments focus on OMSA's associational harm to its members. *Id.* at 33–38. The court will therefore assess standing only as it relates to OMSA, as it "need not consider the standing of the other plaintiffs" if "standing can be shown for at least one plaintiff." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1128, 1232 (D.C. Cir. 1996) (considering standing only as to one plaintiff despite other plaintiffs seeking relief under the APA); *but see, e.g.*, Mar. 10, 2025 Hearing Tr. at 4:5–10, ECF No. 68 (showing Defendants argued that standing must be shown for each plaintiff).

Organizations can sue either on their own behalf ("organizational standing") or on behalf of their members ("representational" or "associational standing"). *See Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 9 (D.D.C. 2018). To demonstrate associational standing, the

organization must plausibly allege that: "(1) at least one of [its] members has standing, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005). The "irreducible constitutional minimum of standing" requires plaintiffs to demonstrate an injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Competitor harm can be an injury in fact if a plaintiff shows "an actual or imminent increase in competition." *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010). Such an increase is sufficient to establish injury where "the increased competition is caused by the agency's action and redressed by restoring the regulatory status quo ante." *Am. Fuel & Petrochemical Manufacturers v. Env't Prot. Agency*, 3 F.4th 373, 379 (D.C. Cir. 2021). With injury established, the rest of the standing inquiry "ordinarily falls into place: the increased competition is caused by the agency's action and redressed by restoring the regulatory status quo ante*." Id.*

OMSA has shown that it is competitively injured. Its harm results from CBP's 30 prior letter rulings and decisions that it claims unlawfully permit non-Jones Act qualified foreign vessels to transport goods. Am. Compl. ¶¶ 51–55, 128–29, 145, 148–50. The result of CBP's actions, in Plaintiffs' view, is that foreign vessels enjoy increased demand for business, while OMSA members do not. "Once CBP authorizes particular activities to be performed by foreign vessels (or even signals an intent to do so), charterers will have a number of incentives to hire foreign vessels over Jones Act-qualified ones." *Id.* ¶ 167. Foreign vessels are cheaper because they do not pay federal taxes, are not subject to federal regulations, and are subsidized by foreign governments. *Id.* The demand for American ships decreases, Plaintiffs contend, because it is "based on future anticipated demand for vessels capable of performing needed operations." *Id.*

¶ 168.  "When CBP exempts—or even signals an intent to exempt—certain aspects of coastwise transportation from the Jones Act, industry participants reduce their investment in Jones Act-qualified vessels capable of performing the operations covered by those exemptions.  [To] compete, market participants will either not build the new vessels, or will build them in foreign shipyards where costs are lower (meaning that the vessel will not be Jones Act-qualified)."  *Id.* ¶ 173.

OMSA specifically alleges that its members suffer actual, competitive harm in each of the CBP's letter ruling categories that it contests: transportation, lifting, pipe repair, decommissioning, and node-related activities.  *Id.* ¶ 145.  It provides member declarations to that effect.  For example, one OMSA member, Hornbeck Offshore, had a contract to perform offshore transport operations, but lost it to a foreign vessel days after CBP withdrew its 2017 notice.  Am. Compl., Ex. 3, Hornbeck Offshore Serv. Decl. ¶ 34, ECF No. 50-3 ("Hornbeck Decl."); two other OMSA members, Candy Fleet and Nautical Solutions, submitted similar declarations.  Am. Compl., Ex. 31, Candy Fleet Decl. ¶ 14, ECF No. 50-31 ("Candy Fleet Decl."); Am. Compl., Ex. 32, Nautical Sol. Decl. ¶ 18, ECF No. 50-32 ("Nautical Sol. Decl.").  Hornbeck Offshore and Harvey Gulf, another OMSA member, have multi-purpose support vessels capable of performing lifting operations, but they compete with foreign-flagged vessels to do so.  Am. Compl. ¶ 163.  The same is true for OMSA Member Otto Candies, even though it notified CBP that foreign-flagged vessels violated the Jones Act in 2015 and 2016.  Am. Compl., Ex. 37, Otto Candies Decl. ¶ 13, ECF No. 50-37.  Hornbeck also faces "depressing demand" for its pipeline or cable laying operations due to CBP's letter rulings, despite having a vehicle capable of performing this activity.  Am. Compl. ¶ 159.  As for decommissioning oil and gas facilities, OMSA member Seacor Marine Holdings declares that it operates a fleet of thirteen lift boats suffering from "depressed demand."  *Id.* ¶ 157.

That reduced demand is allegedly tied to CBP denying OMSA's request for a letter confirming that decommissioning activities must be performed by Jones Act-qualified vessels. *Id.* Hornbeck also claims that it has lost business because of CBP's guidance permitting foreign vessels to be awarded node exploration projects. *Id.* ¶ 161.

In sum, Plaintiffs allege that CBP's refusal to grant OMSA's numerous requests to enforce the Jones Act increases "or imminently will increase, competition in a certain manner." *Delta Air Lines, Inc. v. Exp.-Imp. Bank of United States*, 85 F. Supp. 3d 250, 267 (D.D.C. 2015). That directly harms OMSA's members because CBP's letter rulings encourage charterers to choose foreign vessels. *See Sherley*, 610 F.3d at 72. The lost business is not merely hypothetical because OMSA members declare that they have lost potentially millions after building Jones Act compliant vessels, expecting that CBP would revoke or modify letter rulings in 2009 and 2017. Am. Compl. ¶¶ 170–72 (stating that two OMSA members, Hornbeck Offshore and Harvey Gulf, invested $1,335 million and $760 million, respectively, in reliance on market demand and CBP potential revocations of past letter rulings). Moreover, Defendants concede that Plaintiffs point to "five instances of members losing out on a contract with a third-party." Defs.' Mot. at 23 n.7.

OMSA also establishes traceability and redressability through its competitive injury-in-fact. It alleges that "the increased competition is caused by" CBP's "action and redressed by restoring the regulatory status quo ante." *Am. Fuel & Petrochemical Manufacturers*, 3 F.4th at 379 (holding that competitor standing was established when petroleum producers alleged that the EPA's E15 Rule would increase demand for ethanol). OMSA contends that foreign vessels are cheaper to operate and enjoy a higher demand because CBP exempts them from the Jones Act. Am. Compl. ¶¶ 167–68, 173. Vacatur of the CBP's challenged letter rulings and 2019 decision would redress these injuries.

OMSA also satisfies the other two elements of associational standing—"the interests the association seeks to protect are germane to its purpose," and "neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Libr. Ass'n*, 406 F.3d at 696.  OMSA's purpose is to advocate on behalf of its members who build Jones Act-compliant vessels.  Am. Compl. ¶ 9.  OMSA thus has an interest in challenging CBP's actions, which it claims are adverse to its members' financial interests.  Am. Compl. ¶¶ 170–72.  And neither party argues that Plaintiffs' claims, nor the relief they seek, requires the participation of OMSA's members in this litigation.

Moreover, a "long line of precedent supports the principle that when a particular statutory provision . . . reflect[s] a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision." *Horizon Lines, LLC. v. United States*, 414 F. Supp. 2d 46, 53 (D.D.C. 2006) (internal quotation marks and citation omitted) (collecting cases); *see also Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 6 (1968) ("[I]t has been the rule . . . that when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision.").  The Jones Act protects American shippers.  *See* 46 U.S.C. § 861.  Because OMSA shows that its members, who are American shippers, are suffering competitive harm, its standing theory is within the Jones Act's "zone of interests." *Horizon Lines*, 414 F. Supp. 2d at 53.

### i.    Counterarguments

Defendants' arguments in opposition are unpersuasive.  First, they contend that, under *Shipbuilders Council of Am. v. United States*, 868 F.2d 452, 456 (D.C. Cir. 1989), Plaintiffs lack

standing because they are not parties to each of the challenged letter rulings.  Defs.' Mot. at 26–27.  The court disagrees.

In *Shipbuilders Council*, the D.C. Circuit held that plaintiffs lacked standing when they challenged a "a line of agency rulings" "abstracted from any actual adjudication, rulemaking, or other agency order."  868 F.2d at 456.  But the court does not read that case to require Plaintiffs to be parties to each challenged letter ruling.  Indeed, the Circuit noted two specific instances in which plaintiffs *could* have standing: (1) if they petitioned for judicial review to "overturn or penalize" a third party acting under an unlawful letter ruling, or (2) if they amended their complaint to focus on "any rulemaking in which" the parties themselves participated.  *Id.*  Both scenarios are met here; first, unlike plaintiffs in *Shipbuilders Council,* Plaintiffs petitioned "for judicial review" of CBP's denials of specific letter ruling requests to enforce the Jones Act against foreign vessels; second, they amended their Complaint to target CBP's 2019 decision to modify several rulings, revoke others, and to not change the rest—a process in which they participated during notice and comment.  *Shipbuilders Council*, 868 F.2d at 456; Am. Compl. ¶¶ 62–65, 189.

Second, Defendants argue that Plaintiffs lack standing even under a competitor theory, because their harm is speculative.  Defs.' Mot. at 24.  They rely on two cases: *Energy Transportation Group, Incorporated v. Maritime Administration.*, 956 F.2d 1206 (D.C. Cir. 1992), and *T&S Products, Incorporated v. United States Postal Services*, 68 F.3d 510 (D.C. Cir. 1995).  Neither is analogous.  In *Energy Transportation Group*, plaintiffs "sat by" while the Maritime Administration conducted a bidding process for the sale of three tankers; they did not seek to enter the bidding process even though defendants had solicited interest or firm bids three times—the last one warning that non-bidders would not be contacted.  956 F.2d at 1211–12.  The Circuit found that a "belated effort" did not confer standing given plaintiffs' failure to bid or express interest.

*Id.* That is not the case here; OMSA has steadily and repeatedly opposed CBP's letter rulings concerning foreign vessel encroachment for nearly fifteen years. *See* Am. Compl. ¶¶ 51–55, 128, 148–50.

*T&S Products* is equally unhelpful. There, the D.C. Circuit held that plaintiffs lacked a competitive injury because they had not shown that they had an "on-going" economic relationship with the regions affected by the challenged program. 68 F.3d at 514. Nor had they shown any attempt to expand their business into those areas. *Id.* Here, however, OMSA pleads that its members have a past, present, and future interest in Jones Act-compliant vessels transporting goods, and that those interests are impacted by unregulated foreign vessels. *See* Am. Compl. ¶¶ 51–55, 128, 148–50.

Intervenor-Defendant supplements its motion by pointing to a recent decision by the Fifth Circuit, *Great Lakes Dredge & Dock Co., L.L.C. v. Magnus*, 128 F.4th 678 (5th Cir. 2025); Int.-Def. Not. of Supp. Auth. at 1–3, ECF No. 66 ("Int.-Def.'s Mot."). That Court held that plaintiffs lacked standing to challenge CBP's letter rulings for two reasons. First, plaintiffs challenged a letter ruling for a particular project that was already "completed (and by someone other than [plaintiffs])." 128 F.4th at 683. Second, plaintiffs relied on "four offshore projects in the Northeast that could be affected" by the same letter ruling, "[b]ut the record" said "nothing about the specific 'transactions' or 'operations' those projects might entail." *Id.* at 683–84 (citing 19 C.F.R. § 177.9(b)(4)). Intervenor-Defendant thus argues that "Plaintiffs' standing here is far more speculative" than plaintiffs' standing in that case. Int.-Def.'s Mot. at 2. But Intervenor does not contend that any project affected by the 30 challenged letter rulings has been completed. Nor does it address Plaintiffs' numerous declarations about the projects they lost to foreign competitors or for which they plan to compete. Consequently, the Fifth Circuit's decision is minimally relevant.

Third, Defendants argue that Plaintiffs' harms are too generalized.  Defs.' Mot. at 30.
Defendants rely on *Electric Privacy Information Center v. Federal Aviation Authority*, 892 F.3d
1249 (D.C. Cir. 2018), *Sierra Club v. Environmental Protection Agency*, 754 F.3d 995 (D.C. Cir.
2014), and *National Association of Home Builders v. Environmental Protection Agency*, 667 F.3d
6 (D.C. Cir. 2011).  But Plaintiffs' Complaint is not void of "intent" to engage in the maritime
industry, or "plans" to subject themselves to the Jones Act.  *Sierra Club*, 754 F.3d at 1001; *see
Nat'l Ass'n of Home Builders*, 667 F.3d at 15 (holding that plaintiffs lacked standing, in part,
because the property-specific regulatory scheme they challenged did not "increase[] the risk of
regulation or enforcement relating to" their "particular property").  Nor is the connection between
Plaintiffs' alleged harm and CBP's inaction speculative, as was the case in *Electric Privacy
Information Center*, 892 F.3d at 1255 (holding plaintiffs lacked standing because their purported
injury rested on a "highly attenuated chain of causation" that the challenged FAA regulation would
increase drone use" and attendant privacy violations).  Here, OMSA's "chain of causation" is
relatively straightforward: its members build ships subject to the Jones Act.  *Id.*; Am. Compl. ¶ 9.
Those ships are underemployed due to competition from cheaper foreign vessels that are not
subject to the Jones Act.  Am. Compl. ¶ 167.

Finally, Defendants argue that Plaintiffs' harms are not redressable because they are based
on third party actions, Defs.' Mot. at 27–29.  But Plaintiffs claim that charterers have, in fact, taken
their business to foreign vessels instead of Jones Act compliant vessels, sometimes as a direct
result of CBP letter rulings.  *See, e.g.*, Hornbeck Offshore Decl. ¶ 34.  If this court finds that CBP
violated the APA when it issued those letter rulings, Plaintiffs' harms would be redressed by
vacatur of the letter rulings and CBP's 2019 decision.

To be sure, Defendants are correct that charterers may play an independent role in the maritime market.  They may or may not revert to chartering Jones Act-compliant vessels in the wake of a judgment in Plaintiffs' favor.  But the D.C. Circuit does not require direct traceability when alleging competitor standing.  *See, e.g.*, *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (noting that the Circuit only requires that agency action be at least a "substantial factor motivating the third parties' action" to establish traceability (internal quotation marks and citation omitted)).

**B. Reviewability**

Finally, Defendants argue that CBP's letter rulings are not final agency actions because under CBP regulations, "no other person," other than the parties to the disputed letter ruling, is bound by their holdings.  19 U.S.C. § 177.9(c); *see* Defs.' Mot. at 37–39.  Similarly, CBP's 2019 decision is not a final action because Plaintiffs are not parties to "substantially identical transaction[s]" such that CBP's decision even applies to them.  19 U.S.C. § 1625(c)(2).  Plaintiffs counter that CBP has treated these letting rulings as precedential and thus they are reviewable. Pls.' Opp'n at 18–29.  On this point, Defendants have the stronger argument.

Under the APA, a plaintiff can challenge an agency's decision only if it constitutes a "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  "[T]wo conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process—it must not be tentative or interlocutory. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted).

Defendants' arguments hinge on *Bennett*'s second prong—whether an agency action has "direct and appreciable legal consequences."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S.

590, 598 (2016) (internal quotation marks and citations omitted).  That inquiry is "pragmatic."  *Id.* at 599 (internal quotation marks and citation omitted).  Courts should "make *Bennett* prong-two determinations based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."  *Cal. Cmtys. Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019).  In deciding whether agency action satisfies prong two, this Circuit has considered factors including: (1) "the actual legal effect (or lack thereof) of the agency action in question on regulated entities"; (2) "the agency's characterization of the guidance"; and (3) "whether the agency has applied the guidance as if it were binding on regulated parties."  *Sierra Club v. Env't Prot. Agency*, 955 F.3d 56, 63 (D.C. Cir. 2020).  Applying those factors, the court concludes that the *Bennett* prong-two factors show that CBP's challenged actions are nonfinal.

### i.    *Bennett* Prong-One

As noted, the first *Bennett* factor requires that CBP's challenged actions "mark the consummation of [its] decisionmaking process."  520 U.S. at 178.  That factor supports finality here because CBP's 2019 decision represents the end of the agency's decision-making process in determining whether to revoke or modify certain past letter rulings.  *See* 19 C.F.R. § 177.9(a); 19 U.S.C. § 1625 (c).  In 2009 and 2017, CBP withdrew its proposal to make further changes to various letter rulings after the close of its notice and comment period.  Am. Compl. ¶¶ 51–55.  But in 2019, Plaintiffs urged CBP to reconsider the letter rulings they now challenge here.  Ex. 18 at 1–18.  CBP modified several rulings, revoked others, and left the remainder unchanged.  Compl. ¶¶ 62–65, 189.  While the 2019 decision did not address decommissioning activities, node transportation, or the paid out, not unladen doctrine that Plaintiffs raised in their notice and comment letter, Ex. 18 at 1–18; Am. Compl., Ex. 19 at 84–98, ECF No. 50-19 ("Ex. 19"), there is

no process by which CBP could reconsider its 2019 decision. Nor do Plaintiffs allege that any further administrative process remains. *See* 19 U.S.C. § 1625(c). Indeed, Plaintiff appealed CBP's 2019 decision, and CBP rejected it, explaining that the 2019 decision was not appealable because the notice and comment period had ended. Am. Compl. ¶¶ 66, 68.

### ii.    *Bennett* Prong-Two

As to the second *Bennett* factor, however, CBP's challenged agency actions have no "legal consequence" for Plaintiffs. *Bennett*, 520 U.S. at 178. Plaintiffs argue that "CBP and market participants" "treat CBP's letter rulings as binding with respect to the provision of transportation substantially identical to that discussed in a letter ruling." Pls.' Opp'n at 16; *see also* Am. Compl. ¶¶ 2, 3, 11, 36, 42–48, 168, 180–81; Hornbeck Decl. ¶ 20. When a foreign vessel engages in substantially identical actions that CBP permitted in a prior letter ruling, the foreign vessel, Plaintiffs claim, does not even "seek a new letter ruling" to do so, because "the industry at large as a practical matter [relies] on CBP's past letter ruling in future transactions." Am. Compl. ¶ 42. Yet because neither CBP's letter rulings nor its subsequent modifications and revocations are legally binding on nonparties without a separate evidentiary showing, the court cannot find that CBP's challenged agency actions are final.

### a.   The legal effect of CBP's letter rulings on nonparties

On one hand, CBP makes clear that a letter ruling represents its "official position" regarding a "particular transaction or issue described therein" and is "binding" on all CBP "personnel." 19 C.F.R. § 177.9(a). CBP emphasizes that "each ruling letter setting forth the applicability of the navigation laws to a vessel will be applied only with respect to transactions involving operations *identical* to those set forth in the ruling letter." *Id.* § 177.9(b)(4) (emphasis added).

On the other hand, in a subsequent provision within the same regulatory section, CBP states that "no other person should rely on the ruling letter or assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter." *Id.* § 177.9(c). Therefore, although its regulatory language is less than clear, CBP explains that its letter rulings represent its official position on a particular transaction, but they are not legally binding on nonparties to the letter ruling.

In the administrative law context, CBP's letter rulings are best understood as interpretive rulings, which "advise the public of the agency's construction of the statutes and rules which it administers." U.S. Dep't of Just., Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947).[2] Congress agrees, specifically describing a letter ruling by statute as an "interpretive ruling." 19 U.S.C. § 1625(a).

While "the finality analysis is distinct from the test for whether an agency action is a[n]" interpretive ruling, *California Communities Against Toxics*, 934 F.3d at 635, the D.C. Circuit has found that interpretive rulings are nonfinal agency actions. *See, e.g.*, *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 390 (D.C. Cir. 2013); *Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710, 713, 716–17 (D.C. Cir. 2015). In *American Tort Reform Association*, the Circuit made clear that interpretive rulings "generally do not qualify" as final agency actions because they are not "finally determinative of the issues or rights to which [they are] addressed." 738 F.3d. at 395. In *Huerta*, the Circuit reiterated that when an agency action "is nothing more than an internal guidance document," it "does not reflect final agency action." 785 F.3d at 713.

---

[2] https://perma.cc/6SSX-6SL9

More to the point, the Circuit has not found that legal *consequences* flow from an agency's interpretive letter ruling when the agency's own regulation and practice limit the parties to be bound. In fact, it has emphasized that when a party is not at risk of being penalized for violating an agency action, that action carries "no independent legal authority" as applied to them. *Cal. Cmtys. Against Toxics*, 934 F.3d at 637; *see Valero Energy Corp. v. Env't Prot. Agency*, 927 F.3d 532, 536–39 (D.C. Cir. 2019) (holding that an agency document lacks legal effect when it "only presents" the agency's "position on what the law is and whether" a particular party "has complied"). The Circuit has also held that when a party can only challenge the reasoning of an agency memo, the memo has no binding effect and thus is nonfinal. *See Cal. Cmtys. Against Toxics*, 934 F.3d at 631; *see also Sierra Club*, 955 F.3d at 63 (emphasizing that merely because beneficiaries have "clear avenues by which to challenge" an agency decision does not mean the decision itself is final).

The same is true here. CBP's letter rulings do not impose potential penalties on Plaintiffs. *See CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (reasoning that threat of penalty can signal finality). Nor has CBP ever addressed whether Plaintiffs would be subject to penalties if they did not comply. *Cf. Clean Air Council v. Pruitt*, 862 F.3d 1, 4, 7 (D.C. Cir. 2017) (finding that a final agency action may occur when an agency stays the effect of its action such that parties are not subject to penalties). No letter ruling states or signals CBP's official position as to nonparties. *See Ciba-Geigy Corp. v. Env't Prot. Agency*, 801 F.2d 430, 437 (D.C. Cir. 1986) (reasoning that an agency executive's ruling can also signal finality). Consequently, CBP's letter rulings are not final because they do not subject nonparties "to the same level of [legal] consequence" as parties to the transaction. *Sierra Club*, 955 F.3d at

64. Instead, it appears that CBP issues its letter rulings as guidance to its officials for use on a "case-by-case" basis. *Id.* at 65.

### b. CBP's characterization of its letter rulings

Mindful of the "pragmatic approach" the Supreme Court has instructed courts to take when determining agency finality, *Hawkes Company*, 578 U.S. at 599, the court notes that CBP's characterization of its letter rulings also does not suggest they are final agency decisions. CBP does not, in any of the thirty challenged letter rulings, treat its holdings as binding on nonparties. *See Appalachian Power Co. v. Env't Prot. Agency*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (holding that when an agency "commands" "requires," "orders" or "dictates" a particular action is a factor in favor of finality); Pls.' Opp'n at 22.

Indeed, in the first challenged letter ruling from 1976, CBP addressed only the party asking whether a proposed action complied with the Jones Act and limited its advice to that particular request. CBP wrote that it was responding to a letter "request[ing] advice concerning" a "proposed operation of a diving support work barge in United States waters." Am. Compl., Ex. 12 at 7, ECF No. 50-12. It advised, in part, that the proposed operation would be lawful so long as the barge did "not take on board passengers or merchandise at one point within the[] waters and discharge the passengers or merchandise at another such point." *Id.* at 9. While CBP ordered that the letter be "circulated to all Customs officers to ensure uniformity," it did not order that the industry or nonparties be bound by it.[3] Am. Compl., Ex. 12 at 7, ECF No. 50-12.

Other challenged letter rulings explicitly limit the ruling's holding to the "facts and analysis," Ex. 11 at 74, referencing only the "proposed use," *id.* at 88, or the "proposed operation."

---

[3] Circulating to Customs Officers does not appear to be a routine practice, as only one other challenged letter ruling provided to the court contained that instruction. Ex. 17 at 17.

Letter from James Fritz, Chief, Carrier Rulings Branch, to Benjamin Flowe, Verner Lippfert, Bernhard, McPherson & Hand (Jul. 22, 1992).[4]  At times, CBP referred to "the use of the vessel, as described" in making its holding.  Letter from Arthur Schifflin, Chief, Carrier Rulings Branch, to Robert Alario, President, Alario and Associates Inc. (June 27, 1994);[5] Letter from Georgina Grier, Acting Chief, Entry Procedures and Carriers Branch, to Steven Neuendorff, Clipper Elite Carriers (Sept. 30, 2002);[6] *see also* Ex. 11 at 20; Am. Compl., Ex. 27 at 8, ECF No. 50-8; Ex. 17 at 42; 49, 76, 81, 88, 100, 103, 106, 111.  Even when it issued multiple holdings in one letter, CBP used limiting language such as the vessel "described herein."  Letter from Jerry Laderberg, Acting Chief, Entry and Carrier Rulings Branch, to Harold Mesirow, Robins Kaplan, Miller & Ciresi LLP (Feb. 25, 1997);[7] *see also* Letter from Larry Burton, Chief, Entry Procedures and Carriers Branch, to Dennis A. Hoffman, Commander, Fourteenth Coast Guard District (June 15, 2001);[8] Ex. 17 at 95.  In one letter, CBP states at the outset: "The applicability of the coastwise laws to specific uses of the liftboat listed . . . is considered below," Am. Compl., Ex. 17 at 35, or made clear that its holdings applied to "the proposed use" in "this matter."  Letter from Jerry Laderberg, Chief, Entry Procedures and Carriers, to Terrence Price, Secretary Treasurer, Robert E. Landweer & Co., Inc. (Mar. 31, 1998);[9] *see also* Ex. 17 at 56.

CBP has, on occasion, issued broad holdings.  But in those instances, it emphasized that the letter applied to the parties and their "proposed carriage," "proposed coastwise transportation,"

---

[4] https://perma.cc/FM59-LEMW (labelled as HQ 11218).

[5] https://perma.cc/FWQ8-6AU8 (labelled as HQ 113137).

[6] https://perma.cc/9UZH-4EL2 (labelled as HQ 115799).

[7] https://perma.cc/M4F7-9QMR (labelled as HQ 113838).

[8] https://perma.cc/3FKL-GQ9B (labelled as HQ 115381).

[9] https://perma.cc/G6R6-2JUA (labelled as HQ 114305).

or "proposed use."  Letter from James Fritz, Chief, Carrier Rulings Branch, to Shant Harootunian, American Telephone and Telegraph Company (Aug. 18, 1989);[10] Letter from James Fritz, Chief, Carrier Rulings Branch, to Chris Hurst, Transmarine Navigation Corporation (Sept. 16, 1991);[11] Letter from Larry Burton, Chief, Entry Procedures and Carriers Branch, to Douglas Burnett (Apr. 27, 2001).[12]

CBP's "historical practice," Plaintiffs argue, is to "consistently" treat its "past letter rulings, interpretative guidance, and other treatments as binding when it addresses future substantially identical transactions and makes enforcement decisions." Am. Compl ¶ 36.  They point to multiple instances in which CBP cited its previous letter rulings as authority for why it would not seek further enforcement.  *Id.* ¶¶ 36–39.  CBP even criticized a prior letter ruling related to node transportation, saying that it was inconsistent with a prior line of unrevoked letter rulings.  *Id.* ¶ 40. But that is different than contending that CBP holds out its letter rulings as binding, in all respects, to all nonparties, regardless of the transaction.  The rulings do not "command[]" "require[]," "order[,]" or "dictate[]" nonparties in the maritime industry to do anything.  *Appalachian Power*, 208 F.3d at 1023.

### c.  CBP's application of its 2019 decision revoking or modifying past letter rulings

Plaintiffs maintain that CBP's challenged agency actions are final because CBP's 2019 decision, which modified some letter rulings, revoked others, and left the rest intact, legally binds them even though they are not parties.  Pls.' Opp'n at 11–13.  Because Congress requires any CBP

---

[10]https://perma.cc/R2HY-JQ8K (using "proposed carriage" and labelled as HQ 110402).

[11]https://perma.cc/W7VR-9BWB (using "proposed coastwise transportation" and labelled as HQ 11892).

[12]https://perma.cc/PJ4S-FRBR (using "proposed use" and labelled as HQ 115333).

"proposed interpretive ruling or decision," 19 U.SC. § 1625(c), with "the effect of modifying" past "treatment" be applied to "substantially identical transactions," Plaintiffs argue that they are affected by such transactions. *Id.* § 1625(c)(2); *see* Pls.' Opp'n at 16, 18.

The D.C. Circuit has not assessed whether agency action under Section 1625(c)(2) can be final. But it has explained that "finality looks to the conclusion of activity by the agency." *Ticor Title Ins. v. FTC*, 814 F.2d 731, 745–46 (D.C. Cir. 1987); *see also Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1274 n.6 (D.C. Cir. 2018). Normally, whether an agency action is final is determined by the legal and practical effect of the challenged agency action. *Sierra Club*, 955 F.3d at 63. But when a nonbinding agency action has no legal effect, it does not become final because of its practical effect. *See Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1184–85 (9th Cir. 2019) (concluding that a nonbinding agency action was final because it had "legal and practical effects").

Even assuming Section 1625(c)(2) practically extends CBP's 2019 decision to reach Plaintiffs' current and future vessel transactions, however, the decision is a nonfinal agency action because it has no legal effect on Plaintiffs. The plain text of Section 1625(c) states:

"A proposed interpretive ruling or decision which would –

(1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or

(2) have the effect of modifying the treatment previously accorded by the Customs Service to *substantially identical transactions*;

shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication."

19 U.S.C. § 1625(c)(2) (emphasis added).

Both Section 1625(c) and Section 1625(c)(1) apply to CBP's 2019 decision. As discussed *infra* in Section III.B.2.a, CBP's 2019 decision is an "interpretive ruling or decision." *Id.* In Section 1625(a), Congress defined an interpretive ruling in Subsection A. *Id.* § 1625(a). It described the publication of "any interpretive ruling" as "including any ruling letter, or internal advice memorandum." *Id.* Because CBP's 2019 decision "specifically refers to the revocation and modification of the ruling letters" discussed therein, it is an interpretive ruling within the scope of Section 1625(c). Ex. 19 at 86.

Similarly, CBP's 2019 decision to "modify" "or revoke" some past letter rulings brings the decision within the ambit of 19 U.S.C. § 1625(c)(1). The decision revoked the two *Koff* rulings, HQ H225102 and HQ H235242, *and* modified six other rulings related to transportation, challenged here. Ex. 19 at 97 ("In conclusion, CBP is revoking the following rulings to the extent that they are contrary to the guidance set forth in this notice and to the extent that the transactions are past and concluded: HQ H225102 (Sept. 24, 2012), HQ H235242 (Nov. 15, 2012), HQ H242466 (July 3, 2013)"); Am. Compl. ¶¶ 65, 205–09. Defendants argue that at least Counts II through IV challenge nonfinal agency actions because CBP's 2019 decision did not discuss decommissioning activities, node transportation, or the paid out, not unladen doctrine. Defs.' Mot. at 29–31. But Plaintiffs sought modification of the letter rulings concerning those categories during the 2019 notice and comment period. Ex. 18 at 1–18; Ex. 19 at 84–98. Because the 2019 decision also applies to "any rulings raising the subject issues that may exist but have not been specifically identified," it is irrelevant that CBP only specifically revoked two letter rulings challenged here. Ex. 19 at 86. The effect of its decision extended to any "subject issues" explicitly or implicitly expressed. *Id.* Defendants do not argue, for example, that CBP's 2019 decision is

unrelated to the "subject issues" addressed in the 28 other letter rulings across five different activity categories that Plaintiffs challenged during notice and comment.  Ex. 18 at 1–18.

The court must also determine whether CBP's 2019 decision also had "the effect of modifying" CBP's past "treatment" of Plaintiffs in "substantially identical transactions."  19 U.S.C. § 1625(c)(2).  It did not.

Setting aside the issue of whether Plaintiffs are subject to CBP's past "treatment," the statutory text is silent on the administrative process CBP must use to determine how its 2019 modifications or revocations affect other "substantially identical transactions."  *Id*.  The statute's legislative history also provides no guidance.  *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (When a particular term is not expressly defined in a statute, the meaning of that term may be discerned by "look[ing] to the provisions of the whole law, and to its object and policy.").  Congress's stated intention in enacting Section 1625, at least during debate, was to increase "transparency concerning Customs rulings and policy directives through publication."  H.R. Rep. No. 103-361(*I*), at 124 (1993).

The Supreme Court, however, permits courts to consider how CBP interprets Section 1625(c)(2) to ascertain Congress's intent.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("In exercising such judgment, though, courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes.").  CBP appears to contend that, in enacting Section 1625(c)(2), Congress did not make CBP's modification decisions automatically binding on nonparties to a letter ruling.  In fact, in CBP's 2019 decision, it explained that parties involved in "substantially identical transactions" are not subject to its modification decisions absent a separate evidentiary showing by the parties.  19 U.S.C. § 1625(c)(2).  For example, CBP stated:

> Although in this notice CBP specifically refers to the revocation and modification of the ruling letters listed below, this notice covers any rulings raising the subject issues that may exist but have not been specifically identified. CBP has undertaken reasonable efforts to search existing databases for rulings in addition to those identified. No further rulings have been found. Any person involved in substantially identical transactions should have advised CBP during the comment period. A party's failure to advise CBP of substantially identical transactions or of a specific ruling not identified in this notice may raise issues of reasonable care on the part of the party or its agents for coastwise transportation of merchandise occurring subsequent to the effective date of this notice.

Ex. 19 at 86. Accordingly, CBP clarified that it would determine whether its 2019 decision applied to "substantially identical transactions" at the notice-and-comment phase *or* after the final decision is published, by parties raising "issues of reasonable care." *See id*. Even then, the party must have been "involved" in the transactions for CBP to determine that it would have been affected by it. *Id.*

CBP confirmed as much at oral argument. The court asked Defendants whether CBP has a separate administrative process for determining "substantially identical" transactions *after* its 2019 decision. Mar. 10, 2025 Hearing Tr. at 19:12–13. CBP counsel responded that CBP decides whether a party is subject to a "substantially identical" transaction if it submits "sufficient information," *id.* at 20:1, even earlier than the notice-and-comment phase—when the party seeks "a letter ruling from CBP." *Id.* at 19:16; *see also id.* at 19:14–18; 20:1–3; 19 C.F.R § 177.2(b)(2)(iv).

Plaintiffs did not make the required showing at the letter ruling or notice-and-comment stages. Indeed, Plaintiffs have never been parties to the letter rulings they now challenge. Am. Compl. ¶¶ 1–209.[13] Nor did OMSA argue in CBP's 2017 and 2019 notice-and-comment periods that it or its members were subject to the same or substantially related transactions. Am. Compl.,

---

[13] OMSA did request a letter ruling in 2016 regarding the decommission of offshore oil and gas facilities. Am. Compl. ¶¶ 58, 129. But CBP denied OMSA's request as hypothetical—finding that it was too attenuated for CBP to rule prospectively. *Id.*

Ex. 13 at 1–20, ECF No. 50-13 ("Ex. 13"); Ex. 18 at 1–18.  OMSA simply argued that CBP's proposed modifications or revocations were unlawful.  Ex. 13 at 1–20; Ex. 18 at 1–18.  OMSA's member declarations still do not claim that they are subject to substantially identical transactions. Am. Compl., Paxton Decl. ¶ 8, ECF No. 50-35; Am. Compl., Gellert Decl. ¶¶ 10–11, ECF No. 50-33; Aries Marine Corp. Decl. ¶¶ 15–16.

Under CBP's own regulations, to be subject to the 2019 notice, Plaintiffs still need to "raise issues of reasonable care on the part of the party or its agents for coastwise transportation of merchandise occurring *subsequent* to the effective date of [the 2019] notice."  Ex. 19 at 86 (emphasis added)*.*  Plaintiffs do not claim to have done so.

Accordingly, this court cannot find that Plaintiffs have shown that CBP's 2019 decision has a legal effect on them under 19 U.S.C. § 1625(c)(2).  Because the court holds that Plaintiffs' challenged letter rulings and subsequent 2019 decision are not reviewable, it does not address Defendants' other arguments regarding other reviewability doctrines.  *See generally* Defs.' Mot. at 33–42; *Thomas v. New York*, 802 F.2d 1443, 1447 (D.C. Cir. 1986) (declining to address other arguments that would have no further legal bearing).

### C.  Leave to Amend

Defendants also request that the court deny Plaintiffs' alternative request to amend their Complaint.  Defs.' Mot. at 42–43.  The court agrees, finding that amendment would be futile. *McGee*, 646 F. Supp. 2d at 119 (stating that "[a]n amended complaint is futile if it merely restates the same facts as the original complaint in different terms").

Plaintiffs' Amended Complaint is over 700 pages, more than double the approximately 300 pages in its original Complaint.  *Compare* Compl. at 1–339, *with* Am. Compl. at 1–716.  But the reviewability defect strikes at the heart of Plaintiffs' theory.  CBP cannot act contrary to its own regulations that prevent its letter rulings from binding nonparties; 19 U.S.C. § 177.9(c); similarly,

this court cannot overlook Congress's requirement that parties not be legally subject to CBP's modification and revocation decisions without a further evidentiary showing. 19 U.S.C. § 1625(c)(2). Thus, because Plaintiffs have amended once and the reviewability issue is unlikely to be cured with another bite of the apple, the court will not grant Plaintiffs leave to amend.

IV.    **CONCLUSION**

For the foregoing reasons, the court will GRANT Defendants' Motion for Judgment on the Pleadings and will DISMISS Plaintiff's Amended Complaint without prejudice. A corresponding Order will follow.

Date: September 24, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge